SWARCO, INC. (Swan Rubber Company Division of Amerace Corporation), Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 14753.

United States Court of Appeals Sixth Circuit.

May 23, 1962.

Joseph L. Halberstein, Marion, Ohio (Strelitz, Halberstein & Mitchell, Marion, Ohio, Hubert T. Campbell, Frost & Jacobs, Cincinnati, Ohio, on the brief), for petitioner.

Melvin J. Welles, N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Attys., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before CECIL and WEICK, Circuit Judges, and STARR, Senior District Judge.

CECIL, Circuit Judge.

This case is before the Court upon the petition of Swarco, Inc., to review and set aside an order of the National Labor Relations Board issued against it on September 26, 1961. The National Labor Relations Board hereinafter called the Board, Respondent, filed an answer in which it requested enforcement of its order. (133 N.L.R.B. No. 31.)

The matter was submitted to the Trial Examiner upon a stipulation of facts and the oral testimony of four witnesses. The facts may be briefly summarized as follows:

The petitioning employer at the time this cause of action arose operated two plants, one in Bucyrus, Ohio, and one in Carey, Ohio. Local 267 of the Rubber Workers Union had represented the employees at Bucyrus since 1957. The employees at Carey had been represented by Local 414 of the Rubber Workers Union since 1950. There were separate bargaining units for the two plants whose contracts expired about May 1, 1960. Negotiations which had begun in March broke down over issues of union shop, checkoff and arbitration. On Sunday, May 8, 1960, the two locals struck their respective plants.

The petitioner at Bucyrus was the exclusive producer of special hose products for an automotive manufacturer and other companies and it being in the height of the season, the employer was concerned over the possibility of losing these accounts. The petitioner decided to open the Bucyrus plant immediately. Accordingly, the plant was opened on May 9th and on the first day of opening a substantial number of employees crossed the picket line and went to work. The reporting employees were told that they could have any available job for which they were competent and that they

would be protected against bumping or future layoffs, regardless of previous seniority, as against striking employees who did not return to work before the end of the strike. This preferred seniority was to be applicable to these employees only so long as they remained on the jobs which they chose at the time. The non-striking employees were told to inform the strikers of the employer's promise of superseniority, if they returned to work. Supervisors of the petitioner visited the picket line, in person, and informed the strikers of the offer of superseniority and job transfer.

Additional employees abandoned the strike and returned to work at the Bucyrus plant within the next four days. No new replacements were hired and Local 267 called off the strike a week after it began. Subsequently, in the course of economic layoffs, approximately nineteen of the former strikers were laid off solely because of their reduced seniority under the plan adopted by the employer during the strike. These laid-off employees are the subject of the Board order now before us.

At the time of the strike, the Carey plant had built up a substantial surplus of manufactured products and the employer made no effort to operate that plant until June 2, 1960. On that date the petitioner sent a letter to the Carey employees and offered to them the same superseniority and choice of jobs that was offered to the employees at the Bucyrus plant. This offer was repeated in another letter dated July 8th.

Approximately seventy-five employees returned to work. In addition one hundred seven new employees were hired during the strike. The superseniority offer did not apply to the new replacements. In subsequent negotiations Carey, Local 414, agreed to accept the superseniority policy until June 1, 1961, if the returned strikers who were the beneficiaries of this policy would agree to go back to their old jobs. The returned strikers rejected this by secret ballot on July 16th. The strike was called off on July 23rd. One employee at Carey was laid off on September 19, 1960, solely as a result of his reduced seniority under the respondent's plan. Subsequent to the end of the strike, the union at Bucyrus was decertified by a vote of the employees. In August, 1960, a decertification petition was filed, by certain employees, on the Carey plant. This matter is still pending.

The amended complaint charged that the petitioner violated section 8(a) (1) and (3) of the National Labor Relations Act (Section 158(a) (1, 3), Title 29 U.S. C.A.) by offering and granting superseniority to the strikers at its two plants, if they abandoned the strike and returned to work.

The Trial Examiner, in his intermediate report, recommended that the complaints be dismissed. He found that the strike was an economic one and that the employer was motivated by a sincere desire to keep its plants in operation and not to punish the strikers and that its conduct was based on legitimate economic reasons and, therefore, not violative of the Labor Act. In support of this conclusion he relied on N. L. R. B. v. Potlatch Forests, Inc., 189 F.2d 82, C.A. 9.

The general counsel filed exceptions to the intermediate report and the case was reviewed by the Board. The Board reversed the Trial Examiner and found that the petitioner violated section 8(a) (1) and (3) of the Act by offering and granting superseniority to strikers at its Bucyrus and Carey plants. The Board further found that the petitioner violated these sections by laying off a number of recalled strikers solely as a result of their reduced seniority under the superseniority plan. The Board relied on Erie Resistor Corporation, 132 N.L.R.B. No. 51, in support of its conclusion. This case is now pending on appeal in the Third Circuit.

It is conceded that under the doctrine of N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381, the employer could have hired new employees as replacements of its regular employees, in order to keep

its plan in operation and that it would not have to discharge these replacements after the strike, in order to put the strikers back to work. It is argued on behalf of the employer that if new employees could be hired, as replacements, there is no reason why its own employees could not be put to work as replacements for the strikers.

In reversing the Trial Examiner, the Board did not find that he erred in his findings of fact that the employer did not act to punish the strikers or that it was motivated by a sincere desire to keep its plant in operation in the face of an economic strike. The Board based its reversal on the Erie Resistor case, supra. In that case, the Board held that the granting of superseniority to strikers and strike replacements, in order to induce them to abandon a strike and return to work, was a form of discrimination beyond the purview of an employer's right to replace economic strikers as sanctioned by the Mackay Radio case.

The facts of this case do not bring it within the ambit of the Mackay case. The question posed here is whether, under the facts of this case, the granting of superseniority is a violation of section 8(a) (1) and (3) of the Labor Act. (Section 158(a) (1, 3), Title 29 U.S. C.A.)

We do not consider that N. L. R. B. v. Potlatch Forests, Inc., 189 F.2d 82, C.A. 9, is dispositive of the case at bar. In Potlatch, the union and the employer disagreed over wage differentials in renewing their contract and the union called a strike in August 1947. Near the end of August, the employer was able to resume operations by gradually accumulating both new employees and old employees who crossed the picket line. When the strike was later terminated, the replacements numbered about 1750 out of a normal complement in the bargaining unit of 2600.

The strike being hopelessly lost, the union began negotiations to settle it on October 10, 1947. In the course of these negotiations, the employer vigorously contended for protection of job security of the replacements as against those who would return upon the termination of the strike. The union as vigorously maintained that the seniority rights of the strikers should be preserved. The strike was settled on October 13th and immediately the employer drafted, in writing, the strike seniority policy which gave rise to the action of the Board. The essence of this policy was that the employees who came to work after October 13th were to be laid off ahead of those replacements who were working before that date, in the event a reduction in force should become necessary.

Potlatch maintained this seniority policy without deviation and on February 18, 1949, the International Woodworkers of America, Local 10–364, filed charges against the employer of violation of section 8(a) (1) and (3) of the Act. The Board found a violation of this section 8 (a) (3), on the basis that it provides, "that 'it' shall be an unfair labor practice for an employer * * * by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *" (189 F.2d p. 84).

The court for the Ninth Circuit considered that the sole question for determination was whether the acts charged constituted discrimination under section 8(a) (3) of the Act. A simple "economic strike" being involved, an unfair labor practice could not be sustained unless it was found that the maintenance of the seniority policy was in and of itself an unfair labor practice. (p. 85)

The court found that there was no discrimination between union and non-union members on the basis of union membership. The only discrimination charged was between the replacements, some of whom were strikers returned to work before the strike ended, and the strikers who returned to work after the termination of the strike.

The court held "In the instant case, therefore, the 'discrimination' between

replacements and strikers is not an unfair labor practice despite a tendency to discourage union activities, because the benefit conferred upon the replacements is a benefit reasonably appropriate for the employer to confer in attempting 'to protect and continue his business by supplying places left vacant by strikers.' Hence, we think the specific question posed here has been answered by the Supreme Court by recognizing that an employer attempting to fill a number of positions must be able to offer a substantial degree of security (as well as attractive wages), and that an employer may properly assure the replacements that 'their places might be permanent.' If there are not enough jobs to go around at the time the strike is settled the rights of replacements prevail over strikers." p. 86.

The record does not disclose that the employer promised or assured the replacements that their jobs would be permanent at the time they were employed. Neither is it shown that the employer promised seniority to the employees in order to get them to return to work and abandon the strike.

In Olin Mathieson Chemical Corporation v. N. L. R. B., 232 F.2d 158, C.A.4, affirmed 352 U.S. 1020, 77 S.Ct. 587, the Board found in agreement with the Trial Examiner that the employer changed its seniority policy after the strike so as to give preference to employees who had worked during the strike in order to discipline employees adhering to the strike until the very end. The court found on the facts that the employer "was clearly penalizing the strikers for exercising their right to strike and was thereby clearly discouraging any exercise of this right in the future." 232 F.2d p. 161. The Board's order was enforced.

In N. L. R. B. v. California Date Growers Association, 259 F.2d 587, C.A.9, the court held that there was substantial evidence in the record as a whole to support the Board's finding that the employer "revised its seniority list, * * * not to implement its assurances to the non-strikers but rather for the purpose

of punishing employees who struck against it, and to discourage by this means further activity by those strikers or other employees in behalf of the Union." See also Ballas Egg Products, Inc. v. N. L. R. B., 283 F.2d 871, C.A.6.

N. L. R. B. v. Lewin-Mathis Co., 285 F. 2d 329, C.A.7, is another case involving superseniority granted to replacements as against strikers in an economic strike. *In this case, the replacements were taken from a non-striking unit of the employer's plant.* At their request, they were granted superseniority against returning strikers, as a condition to accepting the employment. The court found that the strikers were economic strikers and that in such case it was lawful to grant superseniority to replacements. This is in accord with the rule announced in N. L. R. B. v. Mackay Radio and Telegraph Co., 304 U.S. 333, at 345, 346, 58 S.Ct. 904, 82 L.Ed. 1381.

■ From a review of these cases involving superseniority, we find that the question of violation of section 8(a) (1) and (3) of the Act, by reason of granting such superseniority, is a question of fact. Each case must be decided on its own particular facts.

■ Section 8(a) (3) of the Act, so far as it is pertinent to this case, provides, in part, "It shall be an unfair labor practice for an employer—by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." If this section is violated, it follows that (a) (1) is also violated. This section makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 (157, Title 29 U.S.C.A.) of this title." Section 7 gives employees the right "to engage in * * * concerted activities for the purpose of collective bargaining or other mutual aid or protection."

■ In the case of an economic strike there is no restraint on the employer communicating with the employees.

This is protected by the first Amendment to the Constitution. N. L. R. B. v. Virginia Electric and Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; N. L. R. B. v. Bradley Washfountain Co., 192 F.2d 144, 153, C.A.7.

In the Bradley case, the court said: "The mandate of the statute is that the employer shall not interfere with or coerce the employees in the exercise of their right to organize and bargain collectively. However, *absent a showing of interference or coercion, or a threat of reprisal or promise of benefit,* in such situations, the employer is free to say to his employees that he wishes to carry on production and, that, if the employees desire so to do, they may return to work.

"* * * In situations such as the one before us, we think the employer may communicate directly to his striking employees the working conditions he is willing to extend to them; and that, if in the exercise of free choice, the employees return to work, no charge of misconduct may properly be levied against him. *If the communications are fair in their description of the situation and they do not offer the returning employees greater benefits than will be extended to those remaining on strike, they do not support a finding of unfair labor practices.*" (Emphasis added.) See also N. L. R. B. v. Wooster Division of Borg-Warner Corporation, 236 F.2d 898, 905, C.A.6, affirmed in part and reversed in part, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed. 2d 823.

In the case at bar, the employer offered the first employees at Bucyrus who voluntarily crossed the picket line superseniority over the employees who remained on strike. It instructed them to carry this word and offer to other employees and it sent supervisors out on the picket line to offer the same inducement to the strikers.

The employer made the same offer to employees at Carey, when it was ready to open that plant. It did this by letter on two separate occasions.

The granting of superseniority to employees who gave up the strike and returned to work was a benefit to them which was not granted to those who remained on strike. It constituted an inducement to give up the strike and a threat of reprisal to those who continued on strike. It was not an easy choice to make—an immediate benefit as against a possible future benefit, if the strike succeeded. To a factory worker, seniority against being laid off, when a reduction in force is necessary, is a very valuable right. The importance of seniority as a tool in the hands of the employer is discussed in the Erie Resistor case, supra.

Although it is conceded that an employer has a right to keep his plant in operation during an economic strike, an honest motive alone for that purpose is not enough. In Radio Officers' Union of Commercial Telegraphers Union v. N. L. R. B., 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 A.L.R. 455, the court said: "Thus an employer's protestation that he did not intend to encourage or discourage must be unavailing where a natural consequence of his action was such encouragement or discouragement."

We conclude that, under the facts of this case, the conduct of the petitioner in urging the strikers to come back to work on the promise of granting those who abandoned the strike and returned to work seniority over those who remained on strike constituted discrimination which did, in fact, discourage membership in the union. Such discrimination interfered with the employees' right to engage in concerted activities for the purpose of collective bargaining and other mutual aid and protection.

Consequently, we find that the petitioner violated section 8(a) (1) and (3) of the Act and an order of enforcement is decreed.