**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TRANSPORT COMPANY OF TEXAS, Respondent.**

No. 30191

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Feb. 10, 1971.

Rehearing Denied March 22, 1971.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

Clifford Potter, Director, N. L. R. B., Houston, Tex., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Eugene B. Granof, Joseph C. Thackery, Attys., N. L. R. B., Washington, D. C., for petitioner.

Powell, Brown & Maverick, William A. Brown, Houston, Tex., for respondent.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

This labor case involves the rights of reinstated economic strikers upon a company's later reduction of force. We hold that they are not to be treated as new employees but must be treated uniformly with nonstrikers.

The case comes to us upon application of the National Labor Relations Board for enforcement of its order issued June 30, 1969, against the Transport Company of Texas.

The Board found that the Company had violated §§ 8(a) (1) and 8(a) (3)

of the National Labor Relations Act[1] by selecting four recalled economic strikers—Everado Delgado, Eusebio Cuellar, Leonardo de la Garza, and Roumaldo Guerra—for layoff based upon their participation in a strike on May 1, 1968. The Board therefore ordered the Company (a) to cease and desist from this unfair labor practice, (b) to offer Delgado reinstatement, (c) to restore all rights and privileges to Cuellar, de la Garza, and Guerra,[2] and (d) to make the four workers whole for any loss of earnings suffered as a result of the Company's unlawful actions. The Board also ordered the usual posting of notices. 177 NLRB No. 82 (1969).

I. The Facts: The Trial Examiner's Conclusions.

The Trial Examiner found the facts to be as follows.

The Company is in the business of hauling crude oil for Pemex, an agency of the Mexican government, from Brownsville, Texas, across the Mexican border and back again. The Company has two categories of employees working at its Brownsville terminal—drivers and mechanics. On December 12, 1966, the Board certified the Oil, Chemical, and Atomic Workers International Union, AFL-CIO, as the Brownsville employees' exclusive bargaining representative. Subsequent contract negotiations between the Union and the Company reached an impasse, and on May 1, 1968, seventeen of the twenty drivers struck. The Company continued to operate, however, by using the three nonstriking drivers and the mechanics to man the trucks. In addition, the Company hired eight replacements for the striking drivers. These replacements were told that they did not have to belong to the Union to work for the Company and that their jobs were not just for the duration of the strike but were "permanent" as long as they did their work properly.

On May 3, 1968, the Union abandoned the strike and immediately applied for reinstatement of all seventeen strikers. The Company, having decided to retain the eight replacements and three nonstriking drivers, needed only four more drivers at the time. On May 4 therefore the Company took back the four men considered to be the best drivers on strike: Manuel Buentello, Rafael Martinez, Everado Delgado, and Justo Castillo. On May 7 the Company decided to increase the number of drivers from fifteen to seventeen and accordingly reinstated strikers Martin Jarmon and Roumaldo Guerra.[3] In the next two months two of the replacements quit, and the Company recalled to work

[1.] 29 U.S.C. § 158(a) (1) and (3).

[2.] At the time of the hearing before the Trial Examiner, Cuellar and de la Garza had been reinstated a second time. Guerra had been offered reinstatement but refused it. The Company contended that since the Brownsville operation had gone out of business there was no position to which Delgado could be reinstated. The Board deferred resolution of this question to the compliance stage of the proceeding, at which time it could more appropriately be considered.

[3.] At the hearing before the Trial Examiner there was some dispute about the character or degree of Guerra's involvement in the strike and about his request for reinstatement. The Company initially stipulated that Guerra was a striker but later withdrew the stipulation—apparently because of evidence developed at the hearing indicating that Guerra's support for the strike was less than wholehearted. On this issue the Trial Examiner concluded:

Although I find that Guerra actually did not work during the strike, although he reported for work, and was in that sense a striker, regardless of his motives this is not of great importance because Respondent concededly believed that he was and treated him as if he were a striker. Terminal Manager Brunk said he knew that Guerra was on strike. Dispatcher Corinas knew that Guerra had gone home during the strike and did not work during it, and Respondent's counsel stated on a number of occasions that Respondent dealt with all four discriminatees on the basis that they were all strikers whether they actually were or not. See the Cooper Thermometer Company, 154 NLRB 502, 504.

strikers Eusebio Cuellar and Leonardo de la Garza. Thus by June 27 the Company had reinstated eight of the seventeen striking drivers; the other nine were never reinstated because they had been replaced and were never again needed.

In July, however, it became apparent that because of a reduction in the amount of their business the Company would be forced to lay off some of its drivers. Accordingly, the Company's General Manager, E. C. Dodds, discussed the matter with William Brown, counsel for the Company. Brown told him that the easiest way out of the problem would be to discharge the permanent replacements because in that event the Union would not complain. Brown added, however, that the Company had no duty to discharge the replacements but was obligated to retain the best drivers regardless of union affiliations. He suggested that Dodds talk over the situation with Cecil Brunk, the resident manager at Brownsville.

Dodds then telephoned Brunk and advised him of the general guidelines that Brown had given him. He instructed Brunk to select his twelve best drivers, advised him not to show preferential treatment to returning strikers, and stated that he had no obligation to discharge replacements first. Indeed, in view of the representations made to the replacements when they were hired, "indications were that possibly they should receive preferential treatment." A day or two later Brunk gave Dodds the names of the four drivers he had selected for layoff—Delgado, Guerra, Cuellar, and de la Garza. Each was one of the striking drivers who had been reinstated in the two months following the strike. Dodds approved Brunk's recommendation, and on July 15 the Company laid off the four named drivers.

At the hearing before the Trial Examiner, Brunk and Dodds explained how

Brunk reached his decision as to which employees the Company should lay off. Keeping in mind counsel's guidelines, Brunk first attempted to retain the twelve best drivers. Peculiarly enough, he decided that all his drivers—nonstrikers, replacements, and reinstated strikers—were of equal ability. On this premise, he was forced to find some basis for the selection other than actual ability. One of the factors he relied upon was the commitment that the Company had made to the replacements: the Company had told them that they were to be permanent, as long as they performed satisfactorily. Since the Company thus had an obligation to retain the replacements and no duty to show preferential treatment to the returning strikers, Brunk went to the list of reinstated strikers to choose the drivers to be laid off. With the exception of Delgado, who had two accidents since being reinstated, Brunk chose the last strikers called back to work. Although, as noted, Brunk had testified that all the drivers were of equal ability, he rationalized his lay-off procedure on the basis of the Company's previous policy of recalling the "best" of the striking drivers first; thus those recalled last were the "least desirable of those that were called back to work."[4] Moreover, elaborated Dodds, there was less moral obligation on the Company's part to keep the men it had hired last—especially since the Company had a commitment to its other drivers.

█ The Trial Examiner further found that in making his selections Brunk did not rely on the drivers' accident records, history of absenteeism or tardiness, experience generally, or length of service with the Company. With the exception of Delgado, Brunk's sole criterion for judging these men to be his "least desirable" drivers was the fact that they were the last drivers recalled to work following the strike. To test the

---

4. On the other hand, the eight drivers who were called back to work were the "best" of the seventeen drivers who participated in the strike. Moreover, Brunk made no effort to assess the relative merits of the replacements hired "hurriedly" during the strike in order to continue operations—except to say that there were no "duds" among the group.

accuracy of that criterion, the Trial Examiner surveyed the driving records of all the drivers and found that with the exception of Delgado, the laid off drivers in fact had accident records equal to or superior to those of the retained drivers.[5]

From this evidence, the Trial Examiner concluded that

the only characteristic that distinguished the laid-off employees from those retained was their participation in the strike. This becomes more apparent from Respondent's emphasis on its commitment to replacements and its stress on its selection of reinstated strikers for layoff on the basis of the order in which they had been reinstated, its point being that since the alleged discriminatees were called back to work after four other strikers had been reinstated, and because strikers were being reinstated in accord with the degree of their "desirability" (competency), the discriminatees ranked lower than those reinstated ahead of them, and this resulted in their layoff. Thus, the only objective

standard used, or suggested as having been used, in determining who should be laid off—once it had been determined that all drivers were "equal" —was the order in which strikers had been reinstated.

The Board adopted these findings and conclusions. See 177 NLRB No. 82 (1969).

We have reviewed the record carefully and conclude that substantial evidence supports the Board's findings as to the Company's method of choosing the drivers to be laid off. See Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Thus the only question for review is whether the Company's method of selection was lawful.

II. The Law: Reinstatement Rights of Economic Strikers.

The National Labor Relations Act, 29 U.S.C. § 151 et seq., provides the statutory basis for the reinstatement rights of economic strikers.[6] Section 2 (3) of the Act defines the term "employee" to include strikers who upon ces-

5. Delgado was a special case. Having had two accidents since being reinstated, he was apparently less desirable than the other reinstated strikers. Whether Delgado would have been selected for layoff had his record been compared with all of the drivers, not just the reinstated strikers, is at best uncertain. Inasmuch as the Company's unlawful action in creating two classes of employees for purposes of layoffs and giving preference to the replacements created this uncertainty, the burden was on the Company as the wrongdoer to disentangle the lawful from the illegal consequences of its misconduct. It did not meet this burden, and therefore the Board properly considered Delgado to be in the same category as the three other strikers found to have been discriminatorily laid off. See N. L. R. B. v. Remington Rand, Inc., 2 Cir. 1939, 94 F.2d 862, 872, cert. denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; cf. N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir. 1966, 360 F.2d 569, 572–573.

6. In a prior decision the Board concluded that the strike of May 1, 1968, was an economic strike rather than an unfair labor practice strike. See 175 NLRB No. 130 (1969). The differences between the two categories of strikers are important in terms of the legal privileges that the strikers possess. An unfair labor practice strike is a protest against an employer who has committed an unfair labor practice. Such strikers have an absolute right to reinstatement when they request to return to work, even if the employer has already arranged to replace them. Mastro Plastics Corp. v. N. L. R. B., 1956, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309, 317–318. An economic strike is one neither prohibited by law nor by collective bargaining agreement nor caused by employer unfair labor practices. Economic strikes are typically for the purpose of forcing employer compliance with union collective bargaining demands. Economic strikers possess more limited reinstatement rights than unfair labor practice strikers. See generally Note, Replacement of Workers During Strikes, 75 Yale L.J. 630 (1969); Note, 58 Calif.L.Rev. 511, 512–13 (1970).

sation of a strike have not obtained any other regular and substantially equivalent employment. While not granting to strikers any substantive rights, § 2(3) makes it clear that strikers retain the rights guaranteed to employees in other sections of the Act. *See* N.L.R.B. v. Mackay Radio & Tel. Co., 1938, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381, 1389–1390; Note, 58 Calif.L.Rev. 511 (1970).

Section 7 of the Act provides that "employees shall have the right to self-organization, to form, join, or assist labor organizations * * * and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The Supreme Court has consistently recognized the strike as a legitimate form of protected concerted activity; indeed, it is "the ultimate weapon in labor's arsenal." N.L.R.B. v. Allis-Chalmers Co., 1967, 388 U.S. 175, 181, 87 S.Ct. 2001, 2007, 18 L.Ed.2d 1123, 1128.

■ Sections 8(a) (1) and 8(a) (3) implement the rights guaranteed to employees by § 7. Section 8(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." Section 8(a) (3) makes it unlawful for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." The prohibition of § 8(a) (3) includes discouraging participation in concerted activities such as strikes. N. L. R. B. v. Erie Resistor Corp., 1963, 373 U.S. 221, 233, 83 S.Ct. 1139, 10 L.Ed. 2d 308, 317; Radio Officers Union v. N. L. R. B., 1954, 347 U.S. 17, 39–40, 74 S.Ct. 323, 98 L.Ed. 455, 476–477.

■ The Trial Examiner concluded that the Company's method of selecting the drivers to be laid off violated both §§ 8(a) (1) and 8(a) (3) of the Act.

Respondent was not required to give preference to strikers or place non-strikers and replacements in a subor-dinate position when deciding who to retain, and in choosing among "equals" it could have given controlling weight to many factors unrelated to concerted activity, but instead it chose to put equals into two different pools and draw only from the one marked "striker." This kind of discrimination is illegal discrimination under the cases, for the reinstated strikers were classified on the basis of their protected strike activity and treated differently and less favorably than they would have been if they had not interrupted their employment by engaging in the strike. Reinstated strikers were not treated uniformly with non-strikers and replacements because their continued employment was not determined by the same criteria. The difference in treatment was substantial for it resulted in substantially increasing the strikers' chances of being laid off. By setting up two classes of "equal" employees separated on the basis of whether they had commitments of employment or had been recently rehired after a strike, Respondent divided its employees on the basis of invidious considerations. By establishing such illegal dual standards with its resultant selection of the alleged discriminatees for layoff, Respondent violated Section 8(a) (1) and (3) of the Act.

The Examiner's conclusion is in accord with our reading of the Act and the relevant cases.

■ Generally economic strikers are entitled to be reinstated after the strike is over and the strikers have unconditionally offered to return to work. *See* Note, Replacement of Workers During Strikes, 75 Yale L.J. 630 & n. 6 (1966); Note, 58 Calif.L.Rev. 511, 513 & n. 15 (1970). In N. L. R. B. v. Fleetwood Trailer Co., 1967, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614, the Supreme Court formulated the rule as follows:

If, after conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their rights to organize and to strike guaranteed

by §§ 7 and 13 of the Act * * *. Under § 8(a) (1) and (3) * * * it is an unfair labor practice to interfere with the exercise of these rights. Accordingly, unless the employer who refuses to reinstate strikers can show that his action was due to "legitimate and substantial business justifications," he is guilty of an unfair labor practice. NLRB v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027, 1035 (1967). The burden of proving justification is on the employer. *Ibid.*

389 U.S. at 378, 88 S.Ct. at 546. Moreover, "It is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy' ". *Id.*

■■■ One "legitimate and substantial business justification" for refusing to reinstate economic strikers is that their jobs may be filled by workers hired as permanent replacements during the strike in order to continue operations. *See* N. L. R. B. v. Mackay Radio & Tel. Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. Another is that the strikers' jobs may have been eliminated during the strike for substantial and bona fide reasons unrelated to their union activity —e. g., in order to "adapt to changes in business conditions or to improve efficiency." N. L. R. B. v. Fleetwood Trailer Co., 1967, 389 U.S. at 379, 88 S.Ct. 543, at 546, 19 L.Ed.2d at 618.

■■■ An employer need not discharge permanent replacements to make room for returning economic strikers. Nevertheless, *Fleetwood;* Laidlaw Corporation v. N. L. R. B., 7 Cir. 1969, 414 F.2d 99, cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100; and this Court's decision in American Machinery Corporation v. N. L. R. B., 5 Cir. 1970, 424 F.2d 1321,[7] make it clear that as "employees" under the Act strikers who have not been reinstated or have not found any other regular employment are on what amounts to a preferential hiring list—that is, they are entitled to be reinstated as new jobs are created or as the departure of replacements creates job vacancies before new applicants can be hired. *See generally* Note, 58 Calif.L. Rev. 511 (1970); Recent Developments, 67 Mich.L.Rev. 1629 (1969). Moreover, if and when strikers are restored to employment, they are entitled to full reinstatement; they are not to be treated as newly hired employees. *See* Hirsch, Laidlaw—The Mackay Legacy, 4 Ga.L. Rev. 808, 809–10 (1970). Once reinstated, strikers must be treated uniformly with nonstrikers and permanent replacements; whatever benefits accrue to the latter from the existence of the employment relationship must also accrue to the returning strikers. Thus the Supreme Court has held that absent some legitimate and substantial business justification it is a violation of §§ 8(a) (1) and 8(a) (3) to refuse to pay vacation benefits to returning strikers when such payments are made to nonstrikers. *See* N. L. R. B. v. Great Dane Trailers, 1967, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027. Similarly the Seventh Circuit has held that the employer violated §§ 8(a) (1) and 8(a) (3) when he refused to reinstate a striker unless he agreed to return as a new employee without accrued seniority and vacation rights. *See* Laidlaw Corp. v. N. L. R. B., 7 Cir. 1969, 414 F.2d 99, enforcing 171 NLRB No. 175 (1968). Finally, the Supreme Court and the Sixth Circuit have held that after an economic strike an employer may not grant super-seniority to replacements he hires during the strike to fill the strikers' jobs unless he can show some overriding business justification. *See* N. L. R. B. v. Erie Resistor Corp., 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308; Swarco, Inc. v. N. L. R. B., 6 Cir. 1962, 303 F.2d 668, cert. denied, 373 U.S. 931, 83 S.Ct. 1533, 10 L.Ed.2d 689. The Supreme Court considers such conduct so "inherently destructive of employee interests" that it may be proscribed without the proof of an antiunion motive,

7. *See also* C. H. Guenther & Son, Inc. v. N. L. R. B., 5 Cir. 1970, 427 F.2d 983.

that is generally required for violations of § 8(a)(3). N. L. R. B. v. Great Dane Trailers, 1967, 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1027, 1034.

*Erie Resistor* is particularly important to this case. In that case the employer announced during an economic strike that it intended to award twenty years additional seniority to replacements hired to continue operations and to strikers who abandoned the strike and returned to work. Because so many workers abandoned the strike, within a few weeks the union was forced to capitulate. Although the employer reinstated most of the strikers, it did so subject to its announced super-seniority plan. When business fell off in the next year and workers had to be laid off, many of the reinstated strikers, whose seniority under the super-seniority system was insufficient to compete with that of the replacements and nonstrikers, lost their jobs. The union filed an unfair labor practice charge with the Board.

The Board held—and the Supreme Court agreed—that "superseniority is a form of discrimination extending far beyond the employer's right of replacement sanctioned by Mackay, and is, moreover, in direct conflict with the express provisions of the Act prohibiting discrimination." 373 U.S. at 225, 83 S.Ct. 1139, at 1143, 10 L.Ed.2d at 313. The Board—and the Court—based its conclusion upon an analysis of the following factors:

(1) Super-seniority affects the tenure of all strikers whereas permanent replacement, proper under Mackay, affects only those who are, in actuality, replaced. It is one thing to say that a striker is subject to loss of his job at the strike's end but quite another to hold that in addition to the threat of replacement, all strikers will at best return to their jobs with seniority inferior to that of the replacements and of those who left the strike.

(2) A super-seniority award necessarily operates to the detriment of those who participated in the strike as compared to nonstrikers.

(3) Super-seniority made available to striking bargaining unit employees as well as to new employees is in effect offering individual benefits to the strikers to induce them to abandon the strike.

(4) Extending the benefits of super-seniority to striking bargaining unit employees as well as to new replacements deals a crippling blow to the strike effort. At one stroke, those with low seniority have the opportunity to obtain the job security which ordinarily only long years of service can bring, while conversely, the accumulated seniority of older employees is seriously diluted. This combination of threat and promise could be expected to undermine the strikers' mutual interest and place the entire strike effort in jeopardy. The history of this strike and its virtual collapse following the announcement of the plan emphasize the grave repercussions of super-seniority.

(5) Super-seniority renders future bargaining difficult, if not impossible, for the collective bargaining representative. Unlike the replacement granted in Mackay which ceases to be an issue once the strike is over, the plan here creates a cleavage in the plant continuing long after the strike is ended. Employees are henceforth divided into two camps: those who stayed with the union and those who returned before the end of the strike and thereby gained extra seniority. This breach is re-emphasized with each subsequent layoff and stands as an ever-present reminder of the dangers connected with striking and with union activities in general.

*Id.* at 230–231, 83 S.Ct. 1139, at 1146, 1147, 10 L.Ed.2d at 315–316. "In light of this analysis," the Court concluded, "super-seniority by its very terms operates to discriminate between strikers and nonstrikers, both during and after a strike, and its destructive impact upon the strike and union activity cannot be doubted." *Id.* at 231, 83 S.Ct. 1139, at 1147, 10 L.Ed.2d at 316. Therefore, the

Court reasoned, the Board did not err in concluding that the employer's super-seniority plan violated §§ 8(a) (1) and 8 (a) (3) of the Act.

In this case the Company seeks to avoid the effect of *Erie Resistor* by confining its holding to that situation in which a formal seniority system exists. In its view, *Erie Resistor* "did not involve the question of relative rights of job tenure upon the event of a subsequent economic reduction of force in the absence of a seniority system." Thus, the Company argues, under the doctrine of *Mackay Radio* it is not an unfair labor practice to grant superior job tenure rights to replacements hired during a strike in order to continue operations; indeed, in order to fill a large number of vacancies, the employer must be able to assure the replacements that their jobs will be permanent. As authority for its position the Company cites the case of N. L. R. B. v. Potlatch Forests, Inc., 9 Cir. 1951, 189 F.2d 82.

A close examination of Justice White's opinion in *Erie Resistor*, however, exposes the flaws in the Company's argument. First, the Company's reliance on *Potlatch Forests* is misplaced. Justice White specifically pointed out in *Erie Resistor* that the Supreme Court had granted certiorari in the case to resolve the conflict over super-seniority between the Ninth Circuit's holding in *Potlatch Forests* and the Sixth Circuit's opinion in *Swarco, Inc.* By agreeing with the Sixth Circuit, the Supreme Court virtually eliminated *Potlatch Forests* as a viable precedent. Second, there is nothing in Justice White's opinion to suggest that *Erie Resistor* should be limited to those situations in which formal seniority systems exist. Although the Erie Resistor Corporation did indeed have a seniority system, it is clear that its grant of "super-seniority" to replacements was merely a method of assuring their job tenure. The award of twenty years additional seniority was not a grant of seniority for all purposes; it would be available only for credit against future layoffs and could not be used for other employee benefits based on years of service. 373 U.S. at 223, 83 S.Ct. 1139, 10 L.Ed.2d at 312. Thus there can be no substantial difference between the employer's award of super-seniority in *Erie Resistor* and the Company's insistence on guaranteeing the job tenure of replacements and nonstrikers in this case. Finally, the Company's argument that its practice of laying off reinstated strikers as a group ahead of replacements is a legitimate corollary of the employer's right of replacement under *Mackay Radio* is effectively answered by Justice White's opinion in *Erie Resistor*. There the Board concluded—and the Court agreed—that

> the employer's insistence that its overriding purpose in granting super-seniority was to keep its plant open and that business necessity justified its conduct was unacceptable since "to excuse such conduct would greatly diminish, if not destroy, the right to strike guaranteed by the Act, and would run directly counter to the guarantees of Sections 8(a) (1) and (3) that employees shall not be discriminated against for engaging in protected concerted activities."

*Id.* at 225–226, 83 S.Ct. 1139, 1144, 10 L.Ed.2d at 313. *See also* American Machinery Corporation v. N. L. R. B., 5 Cir. 1970, 424 F.2d 1321, 1327–1328.

On the authority of *Fleetwood, Laidlaw, American Machinery*, and *Erie Resistor*, we hold that the Board did not err in concluding that the Company's method of selecting the drivers to be laid off—set out in detail in Part I of this opinion—violated §§ 8(a) (1) and 8(a) (3) of the Act. Accordingly, the order of the Board is

Enforced.