**BENDIX–WESTINGHOUSE AUTOMO-
TIVE AIR BRAKE COMPANY,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 20754.**

United States Court of Appeals,
Sixth Circuit.

May 25, 1971.

Thomas J. Quigley, Cleveland, Ohio, for petitioner; Squire, Sanders & Dempsey, Cleveland, Ohio, C. F. Donnelly, B. G. Andrews, C. E. Wasmuth, Jr., Southfield, Mich., on brief.

Herbert Fishgold, N. L. R. B., Washington, D.C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas E. Silfen, Corinna Lothar Metcalf, Attys., N. L. R. B., Washington, D.C., on brief.

Before McCREE, BROOKS, and MILLER, Circuit Judges.

McCREE, Circuit Judge.

We consider a petition by Bendix-Westinghouse Automotive Air Brake Company to review and set aside an order of the National Labor Relations Board, and respondent's cross-application for enforcement of its order.

The Board found that a provision of petitioner's Salaried Employee's Savings and Stock Ownership Plan excluded union-represented employees from continued participation therein and therefore violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1).[1] In a decision and order reported at 185 N.L.R.B. No. 29, the Board ordered petitioner to amend the Plan by deleting the provision, unless the union should waive its statutory right to bargain concerning the Plan or any similar plan or program; to cease and desist from interfering with, restraining or coercing its employees in any like manner in the exercise of their rights; and to post appropriate notices.

Under the Plan, salaried employees may elect to contribute not less than two per cent nor more than eight per cent of their base salary. At the contributor's election, the salary contributions are invested either in United States Government bonds or in Bendix common stock or are equally divided between bonds and stock. For each two dollars contrib-

---

1. (a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *

uted by an employee, the Company purchases one dollar of Bendix stock. Contributions by the Company, and earnings thereon, vest for individual employees according to a schedule, and both contributed and vested amounts can be withdrawn by an employee or his beneficiary upon retirement, disability or death. Article II, Paragraph 2.03 of the Plan makes an otherwise eligible employee ineligible to make contributions to the Plan if he is within a collective bargaining unit of a labor organization recognized as the bargaining agent for unit members. However, the employee would nevertheless be eligible if (a) prior to his making a contribution the Company requests from the Union a waiver of all rights of the union to bargain collectively with respect to the Plan or any substantially similar plan or program; (b) the union grants the waiver in terms acceptable to the Company; and (c) the Company gives its approval[2]

The unfair labor practice charge resulted when the Company adopted the Plan during a compaign by the United Automobile Workers[3] to organize salaried technical and office clerical employees. The Union informed the Company of its representation campaign on July 10, 1969, and filed representation petitions on August 11 (to represent 180 office clerical employees) and on October 8 (to represent 54 technical employees). The Company announced the plan, in summary form, on August 8. On September 11 and 12, the Company

held a series of meetings at which the Plan was explained in detail, and, on September 29, enrollment forms were distributed to the employees. Approximately 65 per cent of the eligible employees enrolled in the Plan. The effective date was October 1.[4] On October 14, the Union lost an election in the unit of office clerical employees by a vote of 96 to 61. No election has been held in the unit of technical employees.

The Union filed unfair labor practice charges on September 30 and November 7. It alleged that the Company's new plan violated Section 8(a) (1) of the Act because it effectively excluded unionized employees from participation and that the Company interfered with, restrained and coerced its employees in violation of that section by distributing a prospectus of the Plan to bargaining unit employees on September 11, 12, and 25, 1969. The Board's Regional Director issued a Complaint and Notice of Hearing on November 10, 1969, which charged the Company with violating Section 8(a) (1) by distributing the prospectus on September 11, 12, and 25 and by maintaining the Plan in effect since October 1969. In his March 26, 1970 decision, the Trial Examiner stated that the sole issue before him was:

Whether the Respondent, by distributing to its Elyria salaried employees the Plan and maintaining it in effect, violated Section 8(a) (1) because of

2. The Bendix Corporation Salaried Employees' Savings and Stock Ownership Plan.

2.03—An Employee shall not be eligible to make contributions if such Employee shall be within a collective bargaining unit for which a labor organization is recognized as collective bargaining agent by any Participating Company, except that, upon approval of the Company, the foregoing provisions of this clause shall not affect the eligibility of such Employee to make contributions to the Plan, if, prior to his making any such contribution, such Participating Company shall have requested and received from such labor organization a waiver, in terms ac-

ceptable to such Participating Company, of all rights of and claims of right by such labor organization to bargain collectively with respect to the Plan or any substantially similar plan or program or to compel such Participating Company to do so, but only so long as such waiver shall remain in effect.

3. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

4. At the time of the unfair labor practice hearing, approximately 71 per cent of the eligible employees had enrolled in the Plan.

[Paragraph 2.03] relating to employee eligibility to participate therein. * *

He then considered the arguments of the parties and decisions in other cases involving similar plans and concluded that:

[T]he language in the Respondent's Plan * * * is inherently restrictive of employees' rights guaranteed in Section 7 of the Act. Accordingly, * * * by maintaining the Plan in effect and publicizing it to its salaried employees, the Respondent has engaged in conduct violative of Section 8(a) (1) of the Act.[5]

However, in his formal conclusions of law, the Trial Examiner did not refer to the publication of the Plan during the representation campaign, but based his holding that petitioner had violated Section 8(a) (1) solely upon the existence of Paragraph 2.03 of the Plan.

In a brief opinion, reported at 185 N.L.R.B. No. 29 (1970), the Board[6] noted its awareness of our decisions in Goodyear Tire & Rubber Co. v. NLRB, 413 F.2d 158 (6th Cir. 1969) (denying enforcement of the Board's order); and Motor Wheel Corp. v. NLRB, 62 CCH Lab.Cas. ¶ 10,824 (6th Cir. 1970) (setting aside the Board's order), but nevertheless adopted the findings, conclusions and recommendations of the Trial Examiner.[7]

Both parties rely upon our previous decisions concerning similar provisions in pension, insurance, or profit-sharing plans, but we have not yet considered the precise question presented here: whether the Company interfered with its employees' exercise of rights protected by Section 7 of the Act by initiating, publicizing and maintaining, during a union representation campaign, the Plan containing this restriction on employee participation.

In Dura Corp. v. NLRB, 380 F.2d 970 (6th Cir. 1967), participation in the Company's Profit-Sharing Plan for Executive and Salaried Personnel was restricted to employees who were not in a bargaining unit recognized by the Company.

Upon the advent of the union, that provision made ineligible for participation in the Plan salaried employees who were in all other respects qualified. Despite the Union's request that its members be allowed to continue in the Plan and the withdrawal of its proposal of an alternative or additional plan, the unionized salaried employees were excluded. In enforcing the Board's order based upon its finding of per se violations of Sections 8(a) (1) and (3),[8] we quoted the following language from Melville Confections, Inc. v. NLRB, 327 F.2d 689, 691 (7th Cir. 1964), cert. denied,

---

5. The Trial Examiner specifically considered Melville Confections, Inc. v. NLRB, 327 F.2d 689 (7th Cir. 1964), cert. denied, 377 U.S. 933, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964); Goodyear Tire & Rubber Co. v. NLRB, 413 F.2d 158 (6th Cir. 1969); Kroger Co. v. NLRB, 401 F.2d 682 (6th Cir. 1968), cert. denied, sub nom. Amalgamated Meat Cutters etc. v. Kroger Co., 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969); Dura Corp. v. NLRB, 380 F.2d 970 (6th Cir. 1967); and Motor Wheel Corp., 180 N.L.R.B. No. 71 (1969). This court subsequently set aside the Board's order in Motor Wheel Corp. v. NLRB, 62 CCH Lab.Cas. ¶ 10,824 (6th Cir. 1970).

6. Chairman Miller and Members Fanning, McCulloch and Brown.

7. Although the Board majority would have factually distinguished *Motor Wheel* and *Goodyear*, they adhered to their position in those cases that the maintenance of such provisions is per se a violation of Section 8(a) (1). Chairman Miller would have held that although such provisions are presumptively violative of Section 8(a) (1), their actual impact must nevertheless be determined in the context of each case. 185 N.L.R.B. No. 29 n. 1 (1970).

8. 29 U.S.C. § 158(a) It shall be an unfair labor practice for an employer * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *.

377 U.S. 933, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964), which we found to be directly in point:

> The conduct of the company in continuing to maintain the provision making union representation a disqualification for eligibility to participate in its employer profit-sharing plan benefits and continuing to bring such restriction to the attention of its employees through distribution of the booklet setting forth company policy constituted a per se violation of Section 8(a) (1). It was employer conduct inherently destructive of rights guaranteed by Section 7. By its inherent nature it interfered with, restrained and coerced employees in the exercise of their right to be represented for collective bargaining by a labor organization. It placed a penalty on such action—a disqualification to participate in profit-sharing benefits. It carried with it its own inherent evidence of intent—it strains credulity to ascribe some other or different intent to the provision. 380 F.2d at 972.

And *Melville*, where a per se violation of Section 8(a) (1) was found, was a case where the restriction on participation had not yet resulted in the termination of participation of members of a bargaining unit. In *Dura*, where employees had actually been excluded, we held that this violation of Section 8(a) (3) was also a per se violation of Section 8(a) (1). *Accord*, Swarco, Inc. v. NLRB, 303 F.2d 668, 672 (6th Cir. 1962), cert. denied, 373 U.S. 931, 83 S.Ct. 1533, 10 L.Ed.2d 689 (1963).

This principle was reaffirmed in Kroger Co. v. NLRB, 401 F.2d 682 (6th

Cir. 1968). In that case, a company's Employees' Savings and Profit-sharing Plan excluded employees who were members of a union which had negotiated a limited-group pension plan with the Company. The Company also denied its bargaining representatives authority to discuss with Union representatives the possibility of amending the Plan to allow the inclusion of union-represented employees. As in *Dura*, employees who fell within the exclusionary provisions were actually required to withdraw from the plan. The Board held, in *Kroger Co.*, 164 N.L.R.B. No. 54 (1967), that Kroger had violated Section 8(a) (1), (3) and (5) [9] of the Act, by maintaining and enforcing the provision and refusing to bargain about it in good faith. We agreed [10] and enforced the Board's remedial order, except to the extent that it required the Company to restore the adversely affected employees to the status they would have enjoyed in the Plan if the provision had not been maintained.[11]

In Goodyear Tire & Rubber Co. v. NLRB, 413 F.2d 158 (6th Cir. 1969), we refused to hold that the maintenance of a similar provision in that company's pension and group insurance plans was per se a violation of Section 8(a) (1) and (3).

> [T]he language in question [had been] inserted in the plans at the Union's request to distinguish between employees who were covered under Company plans and employees covered under various benefit plans negotiated by their collective bargaining representatives * * *, [and there was] no evidence in the record that the Un-

---

9. 29 U.S.C. § 158(a). It shall be an unfair labor practice for an employer—
* * * (5) To refuse to bargain collectively with the representatives of his employees * * *.

10. Although we referred only to Section 8(a) (3) in our discussion of the exclusionary provision, our explicit holding that the Company had violated that section necessarily subsumed a holding that the Company also violated Section 8(a) (1). Dura Corp. v. NLRB, 380 F.2d

970 (6th Cir. 1967); Swarco, Inc. v. NLRB, 303 F.2d 668, 672 (6th Cir. 1962), cert. denied, 373 U.S. 931, 83 S.Ct. 1533, 10 L.Ed.2d 689 (1963).

11. We observed that compliance with that part of the order would necessarily be based substantially upon speculation, because employee participation in the Plan was voluntary, and concluded that the claimed damages could not be determined with sufficient certainty to require their payment.

ion ever sought to have its members covered under the Goodyear plans, or that Goodyear refused to bargain about including these employees in the Company plans. 413 F.2d at 159–160. We observed that "the language was never intended to be used as a wedge against unionization," and held that the record did not "show that this language tended to inhibit the [employees] in the exercise of rights secured to them under the Act." *Id.* at 160.

In *Motor Wheel, supra,* the corporation, which was a subsidiary of Goodyear Tire and Rubber Company, had employed language in its retirement plans identical to that employed by the Company in *Goodyear.* Motor Wheel sought a Labor Board hearing on the unfair labor practice charges based upon the provision, in order to present evidence relevant to the question whether, in the context of the union representation campaign and subsequent negotiations, the mere existence of the language in the Company plan had a tendency to interfere with, restrain or coerce employees in the exercise of their Section 7 rights. The Board denied the Company a hearing and entered judgment on the pleadings, holding that "employee benefit plans which on their face are restricted to participation or enjoyment by employees who are not members of a union, or who have foregone their right to select and bargain through a collective bargaining representative are inherently restrictive of employee rights and * * are per se violations of Section 8(a) (1) of the Act." 1969 CCH NLRB ¶ 21,-

496, at 27,515 (December 16, 1969). We summarily set aside the Board's order on the basis of our decision in *Goodyear.*

In applying the principles stated in these cases to this case, we observe that nothing in our opinion in *Goodyear* denied the premise upon which our decisions in *Kroger* and *Dura* were based:

> Given a free choice [by the employees], the necessity of having to give up the substantial benefits of the plan would naturally have some deterring effect on union membership. *Kroger, supra,* 401 F.2d at 686.

And if, in our case, the provision tended, under the circumstances, to interfere with activity protected by Section 7, then it will be presumed that the Company intended the interference which was the natural consequence of its action. *Id.* at 686. Accordingly, we must determine whether there were circumstances in this case which negated the inherent tendency of the exclusionary provision to inhibit the employees' collective activity.[12]

Petitioner contends that bargaining unit members are not excluded from membership in the Plan because paragraph 2.03 does not require withdrawal of funds previously deposited by or on behalf of bargaining unit members, but merely makes employees ineligible to make further contributions unless the conditions for their continued participation are met. However, it is the right to contribute to the Plan which makes it valuable, since the Company makes corresponding contributions and thereby in-

---

12. This is not a case which requires the balancing of legitimate business interests of the employer against the interests of its employees in concerted activity. Petitioner's statement that "[p]aragraph 2.03 was drafted by and included in the Plan at the behest of the Legal Department of Bendix, apparently to comply with regulations of the Internal Revenue Service and the Securities and Exchange Commission," Brief for Petitioner at 16 n. 1, does not adequately present that issue. Accordingly, no finding that petitioner intended the proscribed effect is required to support the Board's Section

8(a) (1) determination. NLRB v. Erie Resistor Corp., 373 U.S. 221, 227–229, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); cf. NLRB v. Hudson Transit Lines, Inc., 429 F.2d 1223, 1227–1230 (3d Cir. 1970), cert. denied, 401 U.S. 911, 91 S.Ct. 876, 27 L.Ed.2d 810 (1971); compare NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), with NLRB v. Brown, 380 U.S. 278, 286–287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), and American Shipbuilding Co. v. NLRB, 380 U.S. 300, 308–313, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

creases the compensation of those who choose to contribute. The most that can be said for petitioner's argument is that membership in a recognized bargaining unit would not deprive the employees of every benefit available under the Plan. However, the relevant question is whether the potential termination of the right of union members to make further contributions had the proscribed effect.

Petitioner also contends that employees need not lose any benefit as a result of the provision, since they can continue to make contributions if the union grants a requested waiver of bargaining rights and the other requirements of paragraph 2.03 are met. This argument fails at its inception because, if a bargaining representative should be chosen, the employees would be required to relinquish either their right to contribute to the Plan or their statutory right to bargain about the Plan and substantially similar plans and programs. We also observe that the language of the Plan allows the Company to reject an attempted waiver by the union (the Union in *Dura* apparently attempted to make such a waiver, but it was rejected by the Company). Whichever penalty the employees might suffer as a result of selecting a bargaining representative, an illegal restraint would be placed upon their right to take collective action. As the Supreme Court stated in Radio Officers' Union v. NLRB, 347 U.S. 17, 51, 74 S.Ct. 323, 341, 98 L.Ed. 455 (1954):

> Encouragement and discouragement are "subtle things" requiring "a high degree of introspective perception." But, as noted above, it is common experience that the desire of employees to unionize is raised or lowered by the advantages thought to be attained by such action. [Citation omitted.]

Since petitioner introduced the Plan during the pendency of the Union's organization drive and publicized it concurrently with the representation campaign, we hold that the provision violated the Act not *per se* but *per quod*. There are no facts here, as there were in *Goodyear, supra,* which would justify

any other inference concerning the effect upon the employees. The General Counsel sustained his burden of proof by establishing a prima facie case of interference prohibited by Section 8(a) (1) which has not been rebutted.

The petition of the Company to set aside the order of the Board is denied, the order is affirmed, the Board's cross-application for enforcement of the order is granted, and enforcement is ordered.

Enforcement ordered.