**AMERICAN MACHINERY CORPORA-TION, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

**No. 27283.**

United States Court of Appeals, Fifth Circuit.

April 15, 1970.

Norman F. Burke, Orlando, Fla., for petitioner.

Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., Harold A. Boire, Regional Director, N. L. R. B., Region 12, Tampa, Fla., Eugene B. Granof, Atty., N. L. R. B., Washington, D. C., for respondent.

George C. Longshore, Birmingham, Ala., Bernard Kleiman, Gen. Counsel, Pittsburgh, Pa., Bredhoff & Gottesman, George H. Cohen, Washington, D. C., for intervenor United Steelworkers of America, AFL-CIO.

Before TUTTLE, WISDOM and BELL, Circuit Judges.

WISDOM, Circuit Judge:

This case presents the question whether an employer must reinstate permanently replaced economic strikers when positions become vacant as a result of the departure of their replacements. We hold that the National Labor Relations Board properly exercised its statutory authority in concluding that reinstatement is necessary to protect the right of employees to engage in concerted activities. Furthermore, we find that the circumstances of this case justify the imposition of a back pay award even though at the time of the activities in question the Board had not adopted its present view that replaced economic strikers have the right to reinstatement.

## I.

The collective bargaining agreement between American Machinery and United Steelworkers[1] expired on October 15, 1967. Since negotiations were deadlocked, all fifty-one employees in the unit went on strike on October 17, 1967. November 14, 1967, the Company notified each striker by mail that he had been "permanently replaced".

In late January of 1968, the Union requested a resumption of negotiations. The Company questioned the majority status of the Union and refused to bargain on that ground. Although the Union then filed unfair labor practice charges, the Regional Director refused to issue a complaint. His action was sustained on appeal.

March 13, 1968, the strike and all picketing ended. That same day, the Union notified the Company by registered letter, received March 14, that all the strikers unconditionally offered to resume work and requested reinstatement. The letter stated that if there were no openings, the strikers would be available for employment when openings should occur. The Company replied by letter dated March 21, 1968, that no job openings were currently available and that when they did occur, the strikers would be treated as if they were new applicants, provided that they applied for employment and kept their applications current.[2]

Eight strikers thereupon made written application for employment. Nine others made oral requests. Most of them were told that they would receive no seniority credit and would return as new employees. No one kept his application current in the sense that the Company used the term—at least weekly checkups—nor did the Company notify the strikers what keeping their applications "current" required the strikers to do. The President of the Company did tell two strikers who applied that he would notify them of openings.

Between March 14 and the date of the hearing, September 17–18, 1968, American Machinery hired approximately eighty-five persons, utilizing employment agencies and hiring from a nearby closed citrus machinery plant. None of the persons hired were strikers. Although the Company maintained a list of the names, addresses, and telephone numbers of the strikers, it did not inform any of them of openings. Some of the persons hired were less skillful than some of the strikers. As of the date of the hearing, there were at least twenty strikers whose former positions were not occupied by the original replacements.

---

1. April 2, 1969, this Court granted the Motion to Intervene by United Steelworkers of America, AFL–CIO.

2. The letter stated, in part:
   At the time of receipt of your letter and at this time, our work force is fully manned and we have no job openings. When job openings occur, the strikers, like any other applicants, will be considered on a nondiscriminatory basis if they make applications for employment and keep these applications current. We do not give any applicants any preferential hiring status and we will hire to meet our needs from any available source.

In April the Union filed an unfair labor practice charge. The Board issued a complaint against the Company in August 1968 for its failure to offer reinstatement to replaced economic strikers. After a hearing, the Trial Examiner found that the Board's decision in Laidlaw Corporation, 171 NLRB No. 175 (1968), enforcement granted, 7 Cir. 1969, 414 F.2d 99, cert. denied, 1970, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100, required the Company to offer the strikers positions which became vacant and for which they qualified. In *Laidlaw* the Board held that "economic strikers who unconditionally apply for reinstatement at a time when their positions are filled by permanent replacements: (1) remain employees; (2) are entitled to full reinstatement upon the departure of replacements unless they have in the meantime acquired regular and substantially equivalent employment, or * * * the failure to offer full reinstatement was for legitimate and substantial business reasons". 171 NLRB No. 175, 68 L.R.R.M. 1252, 1258. The examiner ruled that American Machinery's treatment of the strikers as new employees with loss of seniority violated section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (3), in that it penalized the strikers for engaging in a protected concerted and union activity. Furthermore, he found violations of the same section in that the failure to reinstate the strikers had the discriminatory purpose of preventing the Union from regaining representative status. Consequently, the Trial Examiner ordered reinstatement for all but three[3] of the strikers listed in the complaint, with seniority and back pay as of the date upon which they should have been reinstated. January 16, 1969, the Board adopted the Trial Examiner's findings, conclusions, and recommendations. This matter is before us on the Company's petition to review and set aside the order and the Board's cross-application for enforcement.

## II.

The background of the Board's present posture must be considered.

NLRB v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, held that section 8 of the National Labor Relations Act prohibits an employer from discriminating on the basis of union activities in its reemployment of striking workers. The real significance of the case in this controversy, however, is its oft-quoted dictum that

Although § 13 [29 U.S.C.A. § 163] provides, "Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike," it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled. 304 U.S. at 345–346, 58 S.Ct. at 910–911, 82 L.Ed. at 1390 (Citations omitted).

And later in the opinion,

the respondent was not bound to displace men hired to take the strikers' places in order to provide positions for them. * * * It might have resorted to any one of a number of methods of determining which of its striking employees would have to wait because five men had taken permanent positions during the strike * * *. 304 U.S. at 347, 58 S.Ct. at 911, 82 L.Ed. at 1391.

The Board adopted this dictum as a decisional rule. Adams Brothers Manifold

---

3. These three strikers applied for and accepted early retirement before the March 14 request for reinstatement.

Printing Co., 17 N.L.R.B. 974, 980 (1939). Thereafter, the established position of the Board with respect to an economic strike was that an employer who hires replacements intended to be permanent thereby cuts off all employment rights of the replaced strikers; the employer could treat the replaced strikers as if they were new applicants. Atlas Storage Division, 112 N.L.R.B. 1175, 1179–80 & n. 15 (1955), enforced *sub nom.* Chauffeurs, Teamsters, etc., Local No. 200 v. NLRB, 7 Cir. 1956, 233 F.2d 233; Brown and Root, Inc., 132 N.L.R.B. 486, 493–494 (1961), enforced in part, 8 Cir. 1963, 311 F.2d 447.

NLRB v. Fleetwood Trailer Co., 1967, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614, like the instant case, involved a strike over economic demands. The Supreme Court in upholding a Board decision, ruled that an employer could not refuse to rehire striking employees simply because at the date they applied he had not yet resumed full production and their jobs had not yet been reactivated. Instead, since the strikers' applications remained current, he must hire them in preference to new employees whenever the jobs were reactivated. The Board proceeded from *Fleetwood* to a new principle enunciated in *Laidlaw:* When job vacancies arise as a result of the departure of permanent replacements, striking employees whose applications are out-standing are entitled to preference over new applicants. It is this principle which the Board seeks to have us approve in this case as the Seventh Circuit has done in Laidlaw Corp. v. NLRB, 7

Cir., 1969, 414 F.2d 99, cert. denied, 1970, 397 U.S. 920, 90 S.Ct. 928, 25 L. Ed.2d 100.

### III.

Section 7 of the National Labor Relations Act affords employees the right to engage in concerted activities. The basic question at issue here is the scope of protection afforded employees in the exercise of this right. Section 8(a) (1) and (3) of the Act provides that

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7];

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*. 29 U.S.C. § 158(a) (1) and (3).

Recent Supreme Court cases have subjected an employer's conduct to scrutiny.[4] NLRB v. Erie Resistor Corp., 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308, held that in some instances no specific intent need be proved to sustain a charge of discrimination. When conduct is "inherently discriminatory or destructive", the employees' interests in concerted activities may outweigh even legitimate business purposes. In NLRB v. Great Dane Trailers, Inc., 1967, 388 U.S. 26, 87 S.Ct. 1792, 18 L. Ed.2d 1027, the Supreme Court set forth the procedure for evaluating the employer's conduct.[5]

4. See generally 9 B.C.Ind. & Comm.L.Rev. 213 (1967).

5. In NLRB v. Great Dane Trailers, Inc., 1967, 388 U.S. 26, 87 S.Ct. 1792, the employer refused to pay accrued vacation benefits to striking employees while it paid such benefits to striker replacements, returning strikers, and nonstrikers, if they had been at work on a certain date during the strike. The Court held that such conduct was violative of Section 8(a) (3) and (1) of the Act, even absent proof of antiunion motivation, because the employer's conduct was likely to discourage par-

ticipation in protected activities and the employer had come forward with no evidence of legitimate motives for his conduct. 388 U.S. at 32–35, 87 S.Ct. 1792. In *Fleetwood* the Court said : "A refusal to reinstate striking employees, which is involved in this case, is clearly no less destructive of important employee rights than a refusal to make vacation payments. And because the employer here has not shown 'legitimate and substantial business justifications,' the conduct constitutes an unfair labor practice without regard to intent." 389 U.S. at 380, 88 S.Ct. at 547.

First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him. 388 U.S. at 34, 87 S.Ct. at 1798, 18 L.Ed. at 1035 (Italics in original).

■ It is in this context that we approach *Fleetwood*, the latest Supreme Court decision in this area. Relying on section 2(3)'s grant of continuing employee status to strikers, the *Fleetwood* Court held that an employer's refusal to reinstate striking employees at the end of an economic strike operates to discourage employees from their rights to organize and strike under sections 7 and 13 of the Act; and that section 8(a)

(3) and (1) made it an unfair labor practice to interfere with the exercise of those rights. In terms of *Great Dane*, then, the burden falls on the employer to establish "legitimate and substantial business justifications" for his conduct. The Court categorically rejected the contention that strikers lose their right to reinstatement because no jobs are available on the date they apply to return to work.[6] And *Fleetwood* instructs us that the question for the courts is whether the Board properly exercised its judgment: "It is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" 389 U.S. at 378, 88 S.Ct. at 546, 19 L.Ed.2d at 617–618 (citations omitted).

American Machinery asserts that it offers a justification sustained by thirty years of Board rule and by the Supreme Court. It relies on the *Mackay* dictum cited earlier and on the reference to that dictum in *Fleetwood*, that "[o]ne [of the recognized legitimate and substantial business justifications] is when the jobs claimed by the strikers are occupied by workers hired as permanent replacements during the strike in order to continue operations". 389 U.S. at 379, 88 S.Ct. at 546, 19 L.Ed.2d at 618. But neither *Mackay* nor *Fleetwood* support the Company's position.

■ Two important, lately questioned,[7] premises do underpin the *Mac-*

---

6. The Court stated:
   It was clearly error to hold that the right of the strikers to reinstatement expired on August 20, when they first applied. This basic right to jobs cannot depend upon job availability as of the moment when the applications are filed. The right to reinstatement does not depend upon technicalities relating to application. On the contrary, the status of the striker as an employee continues until he has obtained "other regular and substantially equivalent employment." (29 U.S.C. § 152(3)). Frequently a strike affects the level of production and the number of jobs. It is entirely

normal for striking employees to apply for reinstatement immediately after the end of the strike and before full production is resumed. If and when a job for which the striker is qualified becomes available, he is entitled to an offer of reinstatement. The right can be defeated only if the employer can show "legitimate and substantial business justifications." NLRB v. Great Dane Trailers, Inc., *supra*, 389 U.S. at 380, 88 S.Ct. at 547.

7. *See, e. g.,* Schatzki, Some Observations & Suggestions Concerning a Misnomer— "Protected" Concerted Activities, 47 Tex.

*kay* dictum: a) that an employer should be able to keep his plant open during an economic strike; b) that the hiring of *permanent* replacements may be necessary to do so. But these premises, even if accepted,[8] do not justify the extension of the dictum to permit the complete termination of the statutory rights of a striking employee when he is replaced. As the *Mackay* Court recognized, the Act extends its protection of employees to "include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute * * * and who has not obtained any other regular and substantially equivalent employment". 29 U.S.C. § 152(3). In *Mackay* the Court concluded only that an employer could offer replacements permanent positions in order to attract them and thus keep his plant in operation, and that he need not dismiss the replacements when the striking employees offered to return to work. The Court said nothing about the strikers' status if the replacements later left for other reasons.[9] In this regard, much has been made of the Court's choice of words in *Fleetwood*: that although the AFL-CIO presented an amicus brief, urging the Court to adopt the position that the Board now takes, the Court nevertheless cited *Mackay* and *Brown and Root* with approval. Or, on the other hand, that the Court specifically conditioned the *Mackay* justification on the fact that the jobs were *"occupied"* by workers and that in *Mackay* the Court said the strikers would have to *"wait"* rather than that their rights were terminated. But the principle of *Fleetwood* is made of sterner stuff than these distinctions.

■■■ *Fleetwood* instructs us that a refusal to reinstate striking employees discourages them from their rights to organize and strike, and that the burden of justification is on the employer. We cannot say that the Board has wrongfully discharged its responsibility to enforce the Act in concluding that American Machinery has offered no legitimate and substantial business justification to sustain its actions. The Company exercised fully the right to offer permanent positions to new employees in order to keep open its business during the strike, and the Board has not challenged that right. Nor does the Board's decision prejudice the Company's ability to offer permanent positions in future economic strikes.[10] We are not impressed with its protestation that the difficulty of seek-

---

L.Rev. 378, 382–392 (1969); Getman, The *Protection of Economic Pressure by Section 7 of the National Labor Relations Act*, 115 U.Pa.L.Rev. 1195, 1203–1205 (1967); Note, Replacement of Workers During Strikes, 75 Yale L.J. 630 (1966).

8. In NLRB v. Erie Resistor Corp., 1963, 373 U.S. 221, 232, 83 S.Ct. 1139, 1147, 10 L.Ed.2d 308, 317, the Court observed that it then had "no intention of questioning the continuing vitality of the Mackay rule," but was not prepared to extend it. *Fleetwood* appears to continue this preservation.

9. Cf. Titan Metal Mfg. Co., 135 N.L.R.B. 196, 211 (1962) ("[T]he Board requires the Respondent, in proving replacement, to show that the replacement actually is employed in the position formerly occupied by the economic striker at the very time when the economic striker unconditionally offers to return; for otherwise, the Board holds the economic striker has not lost his right to reinstatement."); 

Union Bus Terminal of Dallas, Inc., 98 N.L.R.B. 458 (1952).

10. See 26 Wash. & Lee L.Rev. 168, 174 (1969). The most that can be said (and American Machinery does not argue it here) is that in some cases replacements might be deterred from accepting employment by the fear that after a future layoff they could be displaced in the rehiring process by strikers with more seniority. See 67 Mich.L.Rev. 1629, 1637 (1969). This fear is unlikely to be a serious detriment to finding replacements in most situations. See id. at 1638–1639; cf. Schatzki, *supra* note 5, at 384. But if an employer should prove that this factor prevents him from continuing to operate his business, so long as *Mackay* stands the Board may have to consider whether a limited preference would in those circumstances amount to a sufficient justification and whether the preference would be consistent with *Erie Resistor's* prohibition of a super-seniority grant. That case is not now before us.

ing out strikers "several months" or "five years" after their application for reinstatement, when a replacement leaves, justifies its conduct.[11]  In this case, the Company offered reinstatement to no one despite its retention of a list of the employees and their addresses. Indeed, it hired approximately eighty-five new employees within six months of the Union's application, and the first vacancy was the day following the application.  Furthermore, while the resolution is ultimately for the Board subject to limited judicial review under the Act, a concerned employer will find means to cope with this burden.  For example, he might notify the strikers when they request reinstatement of a reasonable time during which their applications will be considered current and at the expiration of which they must take affirmative action to maintain that current status.  A reasonable rule would not contravene *Fleetwood's* assertion that "[t]he right to reinstatement does not depend upon technicalities relating to application". 389 U.S. at 381, 88 S.Ct. at 547, 19 L. Ed. at 619.[12]  *Fleetwood* was aimed at such technicalities as the employer raises here: that the Union had no legal status in the plant at the time it made the reinstatement request and that it could not act as the strikers' agent.  *See* NLRB v. I. Posner, Inc., 2 Cir. 1962, 304 F.2d 773, 774.  Similarly, the Company's argument that the application did not remain current is unpersuasive in light of the fact that the Company never indicated what it meant by "current", that it notified the Union that all the strikers would be treated as new applicants anyway, and that it failed to offer rein-

statement even to those who made out new application forms or received assurances of notification from the Company President.

## IV.

◼◼  The only serious issue remaining is the appropriateness of the Board's order of back pay to the strikers as of the date they should have been reinstated.  American Machinery opposes the order on the ground that *Laidlaw* overruled some thirty years of Board precedent and the Company's action was in conformity with the Board's decisions at the time it was taken.  (*Laidlaw* was not decided until June 13, 1968, whereas the strikers' requests for reinstatement and the Company's denial of them began March 14, 1968).  The Company characterizes the Board's order as "arbitrary, capricious, an abuse of discretion", a departure from its previous decisions, and in effect the promulgation of a rule.  It argues that the Board, therefore, should have followed the rulemaking provisions of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553.[13]  The Company asks us not to apply *Laidlaw* to its conduct.

The Company's argument of surprise is not convincing.  The Supreme Court's decision in *Fleetwood* should have demonstrated the erosion of employers' freedom in treating jobless economic strikers as new applicants.[14]  SEC v. Chenery Corp., 1947, 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995, 2003, moreover, teaches that the effect of retroactivity "must be balanced against the mischief of producing a result which is

---

11.  *See* 82 Harv.L.Rev. 1777, 1779 (1969). Additionally, the Union points out that rehiring after extended layoffs, in accordance with a contractual agreement, is a frequent occurrence in industry.  Intervenor's Brief at 10 n. 5; *see* Steelworkers Handbook on Arbitration Decisions (Pike & Fisher ed. 1960) at 397–398.

12.  In *Fleetwood*, it was "undisputed that the employees continued to make known their availability and desire for reinstatement, and that 'at all times' respondent

intended to resume full production to reactivate the jobs and to fill them".  389 U.S. at 380, 88 S.Ct. at 547, 19 L.Ed.2d at 619.

13.  *See* NLRB v. Majestic Weaving Co., 2 Cir. 1966, 355 F.2d 854; NLRB v. E & B Brewing Co., 6 Cir., 1960, 276 F.2d 594, cert. denied, 1961, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234.

14.  *See, e. g.,* Scallon, Preferential Hiring Rights of Economic Strikers, 19 Lab.L.J. 195 (1968).

contrary to a statutory design or to legal and equitable principles". Consequently, we must look not only to the consequences for American Machinery, but to the statutory scheme and to the effects on the strikers if we do not enforce the order. As we have already demonstrated, the Act and the principles enunciated in *Fleetwood* show that the Board reached a proper resolution in *Laidlaw* and in this case. And to vacate the back pay order would deny a remedy to these employees who were refused reinstatement. The Supreme Court has held that "the Board could properly conclude that backpay is not only punishment for an unfair labor practice, but is also a remedy designed to restore, so far as possible, the status quo which would have obtained but for the wrongful act". NLRB v. J. H. Rutter-Rex Manufacturing Co., 1969, 396 U.S. 258, 265, 90 S.Ct. 417, 421, 24 L.Ed.2d 405, 411–412. We cannot say that the Board should have refused to give redress to these employees.

The Company relying upon NLRB v. Wyman-Gordon Co., 1969, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709, argues that the Board departed from its previous decisional rule when it imposed backpay liability on the Company; that in effect the Board promulgated a rule within the meaning of the Administrative Procedure Act and should therefore have followed the rulemaking provisions. There may be much to be said for the Board's utilizing rulemaking procedures,[15] but the Company misconstrues the Court's decision in *Wyman-Gordon.* That case turned on the Board's determination in Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966) that in all future elections the employer would be directed to file with the Regional Director a list of names and addresses of the eligible voters, the list to be available to all parties to the election proceeding. The Board decided, however, that the new requirement was purely prospective and would not be applied in the *Excelsior* case itself. Although no opinion commanded a majority, six Justices agreed that the Board had erred in attempting in an adjudicatory proceeding to lay down a broad prospective rule, binding upon the affected public generally, but not adjudicating the rights and obligations of the parties before it. The Board's decision, therefore, had not constituted adjudication but had been an attempt to promulgate a rule in violation of the rulemaking provision of the Administrative Procedure Act. It has been suggested that "the *Excelsior* rule would have been approved if it had been applied to the parties before the Board in that case". The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 226 (1969).

In this case, however, the Board did adjudicate the rights of the parties before it in the adjudicatory proceeding, and its decision applied specifically to those parties. Accordingly, the Board was not engaged in rulemaking within the meaning of the Administrative Procedure Act, and was therefore not obligated to follow the procedures set forth therein for rulemaking. *Wyman-Gordon* did not hold that the Board is obligated to follow the rulemaking procedures of the Administrative Procedure Act whenever it announces new policies. Indeed, the Court specifically recognized that "[a]djudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein". 394 U.S. at 765, 89 S.Ct. at 1429. Furthermore, the Court noted, such cases "generally provide a guide to action that the agency may be expected to take in future cases * * * [and] may serve

---

15. There is a great mass of legal writing on rulemaking and adjudication by administrative agencies. For two recent articles see Peck, A Critique of the National Labor Relations Board's Performance in Policy Formulation: Adjudication and Rule-Making, 117 U.Pa.L.Rev. 254 (1968); Robinson, The Making of Administrative Rule-making and Adjudication in Administrative Procedure Reform, 118 U.Pa.L.Rev. 485 (1970).

as precedents". 394 U.S. at 765–766, 89 S.Ct. at 1429.

We subscribe to the views expressed by Judge Friendly in NLRB v. A.P.W. Products Co., 2 Cir. 1963, 316 F.2d 899, 905:

> [W]hen an administrative agency makes law as a legislature would, it must follow the rule-making procedure * * * and when it makes law as a court would, it must follow the adjudicative procedure * * *; whether to use one method of law making or the other is a question of judgment, not of power.

In most situations an administrative agency must be allowed some flexibility in deciding whether adjudication or rulemaking is the proper course to pursue. The long shadows of *Fleetwood* and *Laidlaw* presaged the Board's decision in this case. We cannot say that here the Board abused its discretion or violated the Administrative Procedure Act.

The Trial Examiner's and Board's finding of discriminatory motivation in the failure to rehire further reinforces our conclusion in this case. Under our limited standard of review, there is ample evidence to sustain the finding that the Company was attempting to prevent the Union from regaining majority status. American Machinery refused to hire even those strikers who filed as new applicants and who made separate oral and written applications. Some of the applicants were more capable than those new employees the Company hired and who later left or were let go. It was reasonable for the Board to conclude that refusal of a back pay order in this case would indeed discourage concerted activities by the employees at the American Machinery plant.[16] Consequently, we cannot treat American Machinery as an innocent party unfairly prejudiced by its strict compliance with the law.

We enforce the order of the Board.

---

16. See Laidlaw Corp. v. NLRB, 7 Cir. 1969, 414 F.2d 99.