RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

COCA COLA BOTTLING WORKS, INC., Respondent.

Nos. 24867, 71–1103.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 20, 1971.

Decided July 28, 1972.

---

Mr. Charles N. Steele, Atty., N.L.R.B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Ronald I. Tish, Atty., N.L.R.B., were on the brief, for petitioner in No. 71–1003 and respondent in No. 24867.

Mr. Hugh M. Smith, Dallas, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Mr. J. Parker Connor, Washington, D. C., was on the brief, for respondent in No. 71–1103.

Before WRIGHT, McGOWAN and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

The decision of the National Labor Relations Board now before us arises out of a strike by the Retail, Wholesale and Department Store Union against Coca Cola Bottling Works, Inc. The petitioning Union in No. 24867 complains of the Board's order in certain respects. In No. 71–1103, the Board seeks enforcement. The most significant issue relates to the propriety of the Board's retroactive application of a change in policy effectuated by it through adjudication rather than rule making. For the reasons set forth hereinafter, the order of the Board is enforced only in part.

I

On February 18, 1966 the Union was certified as the collective bargaining agent of the workers at the Company's plant in Dallas, Texas. On July 26, 1966, as the result of a bargaining impasse, the workers went out on strike. The Company decided to continue operations

with employees who chose not to strike and new employees hired to replace the strikers. During the course of the strike, the Company eliminated all of its electric eye bottle inspecting machines and abolished eleven sales helper jobs. The Union maintains that not submitting these decisions to the collective bargaining process constituted an unfair labor practice under Section 8(a)(5) of the National Labor Relations Act,[1] and thus converted what was admittedly an economic strike into an unfair labor practice strike.

Two weeks after the beginning of the strike, some of the strikers began distributing "Health Warning" leaflets in the community, implying that, because of the inexperienced replacements at the plant, Coca-Cola bottles might be unclean and a hazard to health.[2] The Company claims that this leafleting was not protected activity under the Act, and that the Company was therefore justified in subsequently refusing to offer reinstatement to any strikers who personally engaged in it.

The Union announced the end of the strike on November 4, 1966, and at that time requested reinstatement for all striking employees. The Union also asked for a list of all strikers permanently replaced during the strike. Instead of furnishing such a list, the Company responded by asking the Union to submit a list of all strikers who actually desired reinstatement. On November 7, the Union submitted a list of 137 strikers who allegedly desired reinstatement, and on that day 40 of those appeared personally at the plant. The Company spent November 7 interviewing most of those 40 to determine whether or not any of them had engaged in the distribution of the "Health Warning" leaflet. On November 10, the Company notified the Union that 12 of the strikers had been offered reinstatement, but that all other strikers had been permanently replaced or had had their jobs abolished. By November 14, ten of the strikers offered reinstatement were actually reinstated.[3]

Bargaining between the Company and the Union continued after the strike until February 22, 1967.[4] During that time, 242 job vacancies occurred in the normal turnover of personnel. Although aware that a substantial number of former strikers desired reinstatement, the Company never attempted to fill these vacancies by actively seeking out and offering positions to any of the unreinstated strikers, but instead filled them with other applicants obtained through newspaper advertisements and private

1. 29 U.S.C. § 158(a)(5) (1970).

2. The leaflet reads as follows:
   "HEALTH WARNING! Coca-Cola Bottles in Dallas Now Being 'Cleaned and Inspected' by Inexperienced Workers—SPRITE FRESCA COCA COLA BEWARE!—Empty Coke Bottles very often serve as collectors of strange things. Roaches, ants, flies, bugs and even dead mice are sometimes found in return bottles.
   Empty Coke bottles also serve as cigarette ashtrays as well as spittoons in emergencies.
   The highest skill and experience is required by employees who are responsible for cleaning and inspecting the bottles for refills that you get out of dispensers or grocery stores.
   The employees who are now on strike have the experience to protect the quality of the Coca-Cola product and the health of this community. Coca-Cola Bottling Works Inc., is now attempting to run its plant with fewer employees than normal. These stop-gap employees do not have the same level of experience in inspection as the regular employees on strike because of the company's unfair labor practices."

3. The record does not show what became of the other two strikers, but all the parties agree that no vacancies existed on November 14 other than those filled by the ten reinstated strikers.

4. The Union briefly went out on strike a second time, from November 14 to November 17, 1966, apparently in protest over the Company's failure to reinstate all of the original strikers and its failure to come to terms over some of the issues still under negotiation. The Board's finding that this second strike was not an unfair labor practice strike is not assailed by any party here, and is not relevant to any of the issues involved in this petition for review.

employment services. On a number of occasions, however, the Company informed the Union that any of its members who came down to the plant and applied for work would be given "due consideration." Moreover, there is no evidence that any former striker who did so was ever denied reinstatement.

On February 22, 1967, the Company announced that it would no longer bargain with the Union because it did not believe that the Union continued to represent a majority of the employees.

On the basis of these facts, the Board's General Counsel filed a complaint against the Company charging a number of unfair labor practices, and, on December 4, 1970, the Board came to the following conclusions: [5]

1. The elimination of the bottle inspecting machines was not an unfair labor practice because it did not eliminate or significantly affect the job of any employee.

2. The Company committed an unfair labor practice by unduly delaying the reinstatement of the ten employees eventually reinstated on November 14.

3. Although the leafleting was not protected activity, the Company subsequently condoned or forgave the activity, and thus was not justified in refusing to consider any of the participants for reinstatement.

4. The Company's failure actively to seek out and offer reinstatement to unreinstated strikers was an unfair labor practice under the Board's decision in *Laidlaw*, note 5 *supra*.

5. The Company committed an unfair labor practice in withdrawing recognition from the Union on February 22, 1966.[6]

On the basis of these conclusions, the Board ordered the Company to cease and desist from engaging in the cited unfair labor practices. The Board further ordered the Company to make whole the ten strikers whose reinstatement was unduly delayed, and to offer immediate reinstatement to the unreinstated strikers and to make them whole for the Company's failure to offer them jobs as they became available, discharging if necessary any employees hired instead.[7] The Board now seeks enforcement of its order.

## II

■ The Union challenges only the Board's determinations that (1) the elimination of the bottle inspecting machines was not an unfair labor practice, and (2) the distribution of the "Health Warning" leaflets was not protected activity. There is ample evidence in the record to support the finding of the trial examiner, affirmed by the Board, that the elimination of the machines had no significant effect on the job of any worker, and that

5. The Board's decision followed two hearings and two decisions by separate trial examiners. After a hearing and decision by Trial Examiner Youngblood on the General Counsel's original complaint, the Company petitioned the Board for a supplementary hearing in light of the Board's decision in The Laidlaw Corporation, 171 NLRB No. 175 (decided June 13, 1968), *enforced* 414 F.2d 99 (7th Cir., 1969), *cert. denied* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). This petition was granted, and supplementary hearings were held before Trial Examiner Goelrich on the specific issue of the Company's reinstatement obligation after the strike.

6. The Board additionally found that the Company's elimination of 11 sales helper jobs and its raising unilaterally the wages of two employees subsequent to the strike were unfair labor practices since they were not submitted to the bargaining process. Neither of these conclusions is challenged here.

7. Offers of reinstatement were in fact made by the Company in August, 1968, after the Board's decision in *Laidlaw*. Therefore the Company's back-pay liability under the Board's order would extend only from the time each striker should have been offered reinstatement to the time when the Company made valid offers of reinstatement.

consequently the Company was not obliged to submit this decision to collective bargaining. The decision of the Board on this issue is affirmed.

The Board's conclusion that the leafleting was not protected activity rested on its view that the intent and effect of the leaflet was to attack the Company's product rather than inform the public of a genuine issue in a labor dispute.[8] We need not concern ourselves with the validity of this view because the Board resolved the matter in favor of the Union on the basis of condonation. We turn to the Company's challenge to this resolution, after first considering the question of undue delay in reinstatement.

1. *Delay in Reinstatement.*

██ The law is clear that striking employees may request reinstatement collectively through their union;[9] and that, once a request is made, the obligation is upon the employer to offer reinstatement to those employees for whom there are available positions.[10] The Board's position on the issue of undue delay in this case is that the Company's responding to the November 4 request for reinstatement by a counterrequest for a list of names of strikers specifically desiring reinstatement had the effect of shifting the burden back to the employees. Consequently, the Board has taken the position that any delay occasioned by such a counter-request is unreasonable *per se.*

██ The Company argues, on the other hand, that its attempt to find out which strikers actually wanted reinstatement before indiscriminately offering reinstatement to some who may not have wanted it was a reasonable and perhaps more expeditious method of reinstatement. Although the question is not entirely free from doubt, we are not prepared to say that the Board's position is plainly unreasonable or arbitrary. Certainly the employer does not need to know which specific employees desire reinstatement in order to determine which positions are available; and whether the Company's course of action in this case was a more or less expeditious method of reinstatement is a matter well within the expertise of a Board far more familiar than we with the realities of labor-management relations. It is not the function of reviewing courts to substitute their judgment for the determination of an administrative agency, so long as that determination is not plainly capricious.[11]

2. *Condonation of the Leafleting*

██ The Company next challenges the Board's finding that the Company condoned, or forgave, the distribution of the "Health Warning" leaflets by some of the strikers. On Monday, November 7, 1966, the Company's personnel manager, Wortham, interviewed thirty-seven strikers who appeared at the plant seeking

8. *See* NLRB v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U.S. 464, 476, 74 S.Ct. 172, 98 L.Ed. 195 (1953).

9. NLRB v. Brown & Root, Inc., 311 F.2d 447, 451 (8th Cir. 1963).

10. *See, e. g.,* NLRB v. Transport Co. of Texas, 438 F.2d 258, 263 (5th Cir. 1971); Serv-Air, Inc. v. NLRB, 395 F.2d 557 (10th Cir.), *cert. denied,* 393 U.S. 840, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968).

11. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We note that, as a general rule, the Board calculates back-pay liability for failure to reinstate from a date beginning five days after the employee's request for reinstatement,

*see* Aronsson Printing Co., 13 NLRB 799, (1939) presumably reflecting the Board's view that five days is a reasonable time within which to reinstate. Here it appears from the record that (i) the strikers requested reinstatement on Friday, November 4, 1966, (ii) those for whom jobs were available were all offered reinstatement Friday, November 11 (the fifth working day after the request for reinstatement), (iii) some were actually reinstated that day, and (iv) all were reinstated by the following Monday. Although these facts may remove or render insignificant the Company's actual back-pay liability, they do not invalidate the Board's position that any delay occasioned by the Company's request for a list of strikers desiring reinstatement is unreasonable.

reinstatement. The Company maintains that the purpose of the interviews was to screen out from reinstatement those strikers who admitted to personal involvement in the leafleting, and the record indicates that the interviewees were in fact asked about their relationship to that effort. Wortham testified that he made a list of fourteen interviewees who admitted participation, and none of them were reinstated. The Board's finding of condonation is based on the fact that three employees, Parker, Smith, and Reese, who were reinstated, later testified that they had told Wortham that they had participated in the leafleting, and that he had replied that "[T]here [were] no hard feelings, that [they] had done what [they] thought was right." Wortham's testimony, contrarily, is that he never reinstated anyone whom he knew had participated.

All parties agree that

"condonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred."

NLRB v. Marshall Car Wheel & Foundry Co., 218 F.2d 409, 414 (5th Cir. 1955).[12]

However, the fact that there is conflicting testimony on the issue of condonation does not mean that the evidence of condonation is at best equivocal. If, in fact, the Company reinstated some employees despite its knowledge of their participation in the unprotected activity, and if, in fact, it told them that there were "no hard feelings" about it, then the Board's determination that the Company condoned the activity was proper.[13]

While we affirm the Board's determination, we note also that it is supported on the slenderest of reeds. The Board, by crediting the testimony of Parker, Smith, and Reese, purported to find as a fact that Wortham reinstated these strikers despite his knowledge of their participation, discrediting the contrary testimony of Wortham. The trial examiner, however, never ruled on the question of condonation, and never expressly discredited Wortham's testimony or credited the testimony of Parker, Smith, and Reese. Particularly in cases where, as here, the question of condonation on the facts is a close one, the resolution of credibility conflicts is more properly made in the first instance by the trial examiner, who, unlike the Board, has had the opportunity to observe the witnesses and to hear the testimony at first hand.[14] Nevertheless, the trial

12. See also Packers Hide Association v. NLRB, 360 F.2d 59 (8th Cir. 1966).

13. We do not think that the statement of "no hard feelings" without actual reinstatement would amount to more than an equivocal statement, or that reinstatement alone, without that statement, would constitute condonation. See NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 259, 59 S.Ct. 490, 83 L.Ed. 627 (1939); NLRB v. Clearfield Cheese Co., 213 F.2d 70, 75 (3rd Cir. 1954).

14. See NLRB v. Lenkurt Electric Co., 438 F.2d 1102, 1105 n. 3 (9th Cir. 1971); Acme Products, Inc. v. NLRB, 389 F.2d 104, 106 (8th Cir. 1968); Morrison-Knudsen Co. v. NLRB, 276 F.2d 63, 70 (9th Cir. 1960).
What makes the question here particularly difficult is that the Board's resolution of the credibility conflict in the first instance was made in the face of undisputed evidence that Wortham did ask most of the interviewees about their participation in the distribution of the leaflets, which in itself hardly suggests a forgiving attitude on the part of the Company. Moreover, the Board's finding is arguably inconsistent with a stipulation of the General Counsel concerning the interviews. At the hearing before the trial examiner, the Company submitted a list of 14 names as those strikers who had told Wortham that they had participated in the leafleting. Parker, Smith, and Reese were not on that list. The General Counsel stipulated that those fourteen had told Wortham of their participation and were not reinstated. Whether the General Counsel also stipulated that those fourteen were the only strikers who told Wortham of their participation is not clear from the record. Because of the ambiguity in the stipulation, we do not hold the Board concluded

examiner did not make a finding on the issue here, and the Board does have the authority to make credibility determinations in the first instance, and may even disagree with a trial examiner's finding on credibility when he has made one.[15] Because the Board's finding of condonation was based on testimony which was not "hopelessly incredible," [16] we do not disturb its conclusion, although we feel bound to say that the way this matter was handled at both the trial examiner and the Board level does not engender confidence in the Board's fact-finding processes.

### III

The Company's principal opposition to the Board's action in this case is directed against the imposition of a back-pay remedy in respect of the permanently replaced economic strikers to whom it did not offer reinstatement to vacancies that occurred in the normal turnover of personnel. This is the issue which was the subject of the 1969 supplemental evidentiary hearing referred to in Note 5 *supra.* Trial Examiner Goerlich identified the individual strikers who were, in his view, entitled to have reinstatement affirmatively offered them when and as vacancies occurred after November 4, 1966. He found that enough such vacancies had developed by June 21, 1967 to meet this obligation. The Board in its opinion dealt with the matter in these terms:

We have found in agreement with Trial Examiner Goerlich that the Re-

spondent discriminatorily refused to recall and reinstate strikers to available job openings during the period from November 4, 1966, to June 21, 1967, and in order to remedy these unfair labor practices, we shall order the Respondent to offer immediate and full reinstatement to the employees listed on Appendix B attached to this Decision discharging, if necessary, any employee hired after the date of the discrimination against each striker, respectively. . . . We shall also order the Respondent to make these employees whole for any loss of pay suffered by reason of the discrimination against them from the date they should have been so reinstated to the date of valid offers of reinstatement.

Prior to the decision of the Board in *Laidlaw* on June 13, 1968, it was a well settled rule, enunciated and applied by the Board, that when an employer permanently replaced an economic striker, he was under no obligation thereafter to treat that striker other than as a new applicant for employment.[17] Although he was not permitted to discriminate against a former striker on the basis of his prior protected activity,[18] he was not obliged actively to seek out and to offer former strikers reinstatement in preference to other applicants, or to accord rehired strikers their full former accrued rights and pay. Relying largely on the Supreme Court's opinion in NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), the Board in *Laidlaw* overturned this rule, and held

on the issue of whether Parker, Smith, and Reese, who were reinstated, also told Wortham prior to their reinstatement.

15. *See* Nix v. NLRB, 418 F.2d 1001, 1008 (5th Cir. 1969) ; Acme Products, Inc. v. NLRB, 389 F.2d 104, 106 (8th Cir. 1968) Amco Electric v. NLRB, 358 F.2d 370, 373 (9th Cir. 1966) ; Joy Silk Mills v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951).

16. NLRB v. Marcus Trucking Co., 286 F.2d 583 (2d Cir. 1961). *See also* NLRB v. C. Malone Trucking Inc., 278 F.2d 92 (1st Cir. 1960) ; NLRB v. Dinion Coil Co., 201 F.2d 484 (2d Cir. 1952).

17. *See* NLRB v. Brown & Root, 132 NLRB 486 (1961), *enforced* 311 F.2d 447 (8th Cir. 1963) ; American Flint Glass Workers' Union v. NLRB, 97 U.S. App.D.C. 244, 230 F.2d 212, cert. denied, 351 U.S. 988, 76 S.Ct. 1047, 100 L.Ed. 1501 (1956) ; Chauffeurs, Teamsters & Helpers "General" Local No. 200 A.F.L. v. NLRB, 233 F.2d 233 (7th Cir. 1956) ; Sax v. NLRB, 171 F.2d 769, 771 (7th Cir. 1948) ; Hot Shoppes, Inc., 146 NLRB 802 (1964) ; Texas Boot Mfg. Co., 143 NLRB 264 (1963).

18. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

that former strikers, although not entitled to reinstatement in preference to replacements permanently hired during the strike, are entitled to offers of reinstatement to vacancies resulting from the subsequent departure of permanent replacements; and they remain so entitled until they have obtained "other regular and substantially equivalent employment." [19]

Applying the *Laidlaw* rule, the Board in this case determined that the Company committed unfair labor practices in failing to seek out and to offer to former strikers reinstatement to vacancies occasioned by the departure of replacements hired during the strike, and has imposed backpay liability against the Company on the basis of these unfair labor practices. Since all of the events relevant to this determination occurred before the Board's decision in *Laidlaw*, the Company protests the seeming inequity of branding as unfair, and imposing a back-pay remedy for, actions which, when undertaken, were squarely within explicitly articulated Board policy as sustained by the courts.

The Company does not assail the validity of the *Laidlaw* rule itself; and, were the validity of that rule directly before us, we would have no difficulty in joining the growing number of circuits that have upheld it.[20] The issue presently before us involves only the question of its retroactive reach in the circumstances of this case.

Whether to give retroactive effect to new rules adopted in the course of agency adjudication is a difficult and recurring problem in the field of administrative law. It has arisen with notable frequency in the review of decisions by the Board. In order to establish an alternative procedure where inequity may be avoided, the Administrative Procedure Act, 5 U.S.C. § 551 et seq., has authorized agencies to conduct formal rule making proceedings, in which all interested parties are notified, hearings conducted, and new rules thereby adopted. *See also* 29 U.S.C. § 156 (1970). Rules so adopted are prospective in application only. 5 U.S.C. § 551(4) (1970). Despite substantial and repeated scholarly and judicial criticism, the Board has largely ignored the rule making process, and has chosen rather to fashion new standards and to abrogate old ones in the context of case-by-case adjudication. *See, e. g.,* 1 Davis, Administrative Law § 6.17 (1970 Supp.); Peck, The Atrophied Rule-making Powers of the National Labor Relations Board, 70 Yale L.J. 729 (1961); Shapiro, The Choice of Rulemaking or Adjudication in Development of Administrative Policy, 78 Harv.L.Rev. 921 (1965); NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed. 2d 709 (1969).

Judge Henry Friendly has observed that "There has been increasing expression of regret over the Board's failure to react more positively to the Supreme Court's rather pointed hint, SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), (footnote omitted) that since an administrative agency has 'the ability to make new law prospectively through the exercise of its rule-making powers, it has less

---

19. 29 U.S.C. § 152(3) (1970). In *Fleetwood*, the Supreme Court had held that an employer's refusal to reinstate former strikers to positions which became available because of an expansion of the business after the strike constituted an unfair labor practice under Sections 8(a) (1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3). In *Laidlaw*, the Board extended this principle to failures to offer reinstatement to positions available because of post-strike departures of replacements permanently hired during the strike.

20. NLRB v. Laidlaw Corp., 414 F.2d 99 (7th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970); American Machinery Corp. v. NLRB, 424 F.2d 1321 (5th Cir. 1970); NLRB v. Johnson Sheet Metal, 442 F.2d 1056 (10th Cir. 1971); NLRB v. Hartmann Luggage Co., 453 F.2d 178 (6th Cir. 1971); H. & F. Binch Co., Plant of Native Laces and Textile Division of Indian Head, Inc. v. NLRB, 456 F.2d 357 (2nd Cir. 1972).

reason (than a court) to rely upon *ad hoc* adjudication to formulate new standards of conduct' . . . ." NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir. 1966). And Judge Friendly went on to say in that case:

> Although courts have not generally balked at allowing administrative agencies to apply a rule newly fashioned in an adjudicative proceeding to past conduct, a decision branding as "unfair" conduct stamped "fair" at the time a party acted, raises judicial hackles. . . . And the hackles bristle still more when a financial penalty is assessed for action that might well have been avoided if the agency's changed disposition had been earlier made known or might even have been taken in express reliance on the standard previously established.

In a Second Circuit decision handed down since this case was taken under submission and brought to our attention by the Board, H. & F. Binch Co. Plant of Native Laces and Textile Division of Indian Head, Inc. v. NLRB, note 20 *supra,* Judge Friendly wrote for the court in sustaining a retroactive application of *Laidlaw.* He noted, however, that

> . . . the *Laidlaw* decision established a new norm of employer conduct toward strikers who had sought or achieved reinstatement, *cf.* NLRB v. Majestic [Weaving] Co., 355 F.2d 854, 860–861 (2 Cir. 1966). Binch, in effect, is saying that the time has come when courts should stop merely shedding crocodile tears over the Board's failure to utilize its rule-making power and calling its attention to the Supreme Court's

'rather pointed hint' on that subject in the second *Chenery* case . . . and should administer the one kind of medicine the Board will have no difficulty in understanding. . . .

456 F.2d at 365. After saying that "It is indeed surprising that the Board should so consistently have refused to utilize its rule-making power, or to develop techniques of prospective ruling and overruling . . .," Judge Friendly concluded that " . . . we do not deem this case an appropriate vehicle for taking the action the company seeks . . . .," since the events in question occurred after *Fleetwood* and, accordingly, "the extension in *Laidlaw* thus was hardly a great surprise." *Id.* It was in the light of this salient fact that he weighed the hardships to the employees against " . . . the hardship in imposing liability on the company for conduct conforming to what it may reasonably have thought the limit of its duties . . .," and concluded to "await a stronger case before we refuse to give retroactive force to a Board order because it was founded on a decision enunciating a stricter rule of conduct for employees or unions than the Board had previously imposed." In the case before us, this pivotal fact is missing, since the Company here, during the period referred to by the Board as giving rise to its remedy, acted without the benefit of *Fleetwood.*[21]

■ In deciding whether to grant or deny retroactive force to newly adopted administrative rules, reviewing courts must look to the standard established by

---

21. Earlier in his decision in *Binch,* Judge Friendly referred to *Laidlaw* as "a per-missible extrapolation from what the Supreme Court had decided in NLRB v. Great Dane Trailers, Inc., *supra,* 388 U.S. at 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027, and NLRB v. Fleetwood Trailer Co., *supra,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614, . . . ." 456 F.2d at 364. Those decisions came down, respectively, on June 12 and December 18, 1967. The unfair labor practice, upon which

the backpay order in question here is founded, was said by the Board to be the Company's failure to reinstate strikers between November 4, 1966 and June 21, 1967. Although perhaps in theory *Great Dane* might have furnished an exceptionally alert and astute counsel with a few days foreboding of the future *Laidlaw* rule, *Fleetwood* was a far more significant signal of a necessary change in Board policy.

the Supreme Court in SEC v. Chenery, *supra:*

> . . . [R]etroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.

332 U.S. at 203, 67 S.Ct. at 1581. Which side of this balance preponderates is in each case a question of law, resolvable by reviewing courts with no overriding obligation of deference to the agency decision, NLRB v. Guy F. Atkinson Co., 195 F.2d 141 (9th Cir. 1952); and courts have not infrequently declined to enforce administrative orders when in their view the inequity of retroactive application has not been counterbalanced by sufficiently significant statutory interests. *See* NLRB v. Majestic Weaving Co., *supra*; NLRB v. E & B Brewing Co., 276 F.2d 594 (6th Cir. 1960); NLRB v. International Brotherhood of Teamsters, 225 F.2d 343 (8th Cir. 1955); Pedersen v. NLRB, 234 F.2d 417 (2d Cir. 1956); NLRB v. Local 176, 276 F.2d 583 (1st Cir. 1960).

■■■■■ Among the considerations that enter into a resolution of the problem are (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule,

(4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard. Taking all of these considerations into account, we find that the inequity of applying the *Laidlaw* rule to the facts of this case far outweighs the interests that might be furthered if it were applied.

First, while the Supreme Court has observed in *Chenery* that "[E]very case of first impression has a retroactive effect . . .," this is not a case of first, but of second impression. The case in which the rule in question was adopted by the Board was *Laidlaw* itself, and, although the Seventh Circuit upheld its application to the employer there, it must be recognized that "[t]he problem of retroactive application has a somewhat different aspect in cases not of first but of second impression." [22] The Supreme Court has identified a number of reasons calling for the application of a new rule to the parties to the adjudicatory proceeding in which it is first announced— reasons that do not apply with the same force to subsequent proceedings.[23] Thus the Court has suggested that to deny the benefits of a change in the law to the very parties whose efforts were largely responsible for bringing it about might have adverse effects on the incentive of litigants to advance new theories or to challenge outworn doctrines. The Court has also made reference to "[s]ound policies of decision-making, rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies. . . ."[24]

22. NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir. 1966). The fact that this circuit has not yet had occasion to rule on the validity of the *Laidlaw* rule clearly does not render this a case of "first impression" for purposes of retroactivity analysis, the principal concern of which is lack of notice and the degree of reliance on former standards. Since it is normally the *Board's* first announcement of a new rule in an adjudicatory setting that puts parties on notice and ends their ability to claim re-

liance on a previous standard, the question of retroactive application should not turn on whether the particular judicial forum the parties have chosen has had occasion to pass upon the rule.

23. Although discussed in the context of constitutional adjudication, these reasons have equal relevance to the field of administrative law.

24. Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *See also* Mishkin, Foreword, The

This approach may have a special legitimacy in the agency field. In NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), a plurality of the members of the Supreme Court differentiated sharply between the Board's quasi-legislative (rule making) and quasi-judicial (adjudicatory) powers, suggesting that both the Board's own statute and the Administrative Procedure Act limit the Board's use of the latter to promulgate rules of wholly prospective application. In the various expressions to this effect, there was emphasis upon the circumstance that the Board, in its earlier purported adjudication relied upon by it in that case, had concluded to make its decision announcing a new principle of labor relations prospective only; and this circumstance was strongly intimated to be a potent indicator of rule making.

Whatever may be the precise reach of *Wyman-Gordon* in terms of agency power to engage in wholly prospective adjudication, *see* The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 220–27 (1969), it does not prevent an agency in adjudication from declining in subsequent cases to apply a new rule retroactively if equitable or statutory considerations militate against it, any more than Article III prevents a federal court from limiting the retroactive scope of new legal principles articulated in judicial decisions. Nor does *Wyman-Gordon* prevent reviewing courts from refusing to enforce such retroactive orders when the circumstances so dictate.[25] In short, some of the considerations which support retroactivity in cases of first impression are, in subsequent cases, absent from the scale on which a court must weigh its decision.

The standard to which the Company attempted to conform its conduct in this case was well established and long accepted by the Board. Unlike *Chenery*, this is not the kind of case where the Board "had not previously been confronted by the problem" and was required by the very absence of a previous standard and the nature of its duties to exercise the "function of filling in the interstices of the Act."[26] Rather it is a case where the Board had confronted the problem before, had established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted.[27]

The record shows that in this case the Company at all times sought and closely followed the advice of counsel. The trial

Supreme Court, 1964 Term, 79 Harv.L. Rev. 56, 60–61 (1965).

25. Whether a reviewing court under the *Wyman-Gordon* rationale is required to enforce a retroactive order applied by the Board in a case of first impression is unclear. We note that a number of reviewing courts have refused to enforce such orders. NLRB v. E & B Brewing Co., 276 F.2d 594 (6th Cir. 1960); NLRB v. International Brotherhood of Teamsters, 225 F.2d 343 (8th Cir. 1955); NLRB v. Guy F. Atkinson Co., 195 F. 2d 171 (9th Cir. 1952). The power to do so would seem implicit in the standard articulated in *Chenery*.

26. 332 U.S. at 202, 203, 67 S.Ct. at 1580, 91 L.Ed. 1995 (1947). *See also* Davis, Administrative Law § 17.08 (1970 Supp.), where Professor Davis observes: "Surely the difference between [retroactive clarification of uncertain law] and retroactive change in clear law that has been specifically relied upon can and should be recognized."

27. In its brief and supplemental memorandum, the Board has cited four cases in addition to *Laidlaw* itself in which the courts have enforced the *Laidlaw* rule. American Machinery Corp. v. NLRB, 424 F.2d 1321 (5th Cir. 1970); Guenther & Son, Inc. v. NLRB, 427 F.2d 983 (5th Cir. 1970), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246; NLRB v. Johnson Sheet Metal, 442 F. 2d 1056 (10th Cir. 1971); and NLRB v. Hartmann Luggage Co., 453 F.2d 178 (6th Cir. 1971). In two of these, the events in question occurred after *Laidlaw* was decided. *Johnson Sheet Metal* and *Hartmann Luggage, supra.* And in *American Machinery* and *Guenther, supra,* the Fifth Circuit noted that "The long shadows of *Fleetwood* and *Laidlaw* presaged the Board's decision[s] in [these] case[s]." 424 F.2d at 1330, 427 F.2d at 986.

examiner credited the testimony of personnel manager Wortham that, although the Union was told that any replaced strikers who wanted to come back should get in touch with the Company, he did not individually notify former strikers as vacancies occurred because he did not think that the law obliged him to do so. Promptly after *Laidlaw* was announced the Company sent offers of reinstatement to each striker. Unless the burden of imposing the new standard is *de minimis,* or the newly discovered statutory design compels its retroactive application, the principles which underlie the very notion of an ordered society, in which authoritatively established rules of conduct may fairly be relied upon, must preclude its retroactive effect, at the least, in the pre-*Fleetwood* period.

The Board does not now deny or minimize any of the reasons just advanced which militate against the application of its order to past conduct, but rather attempts to justify that retroactivity solely by reference to the statutory design. A distinction must, however, be made between the purpose of a statute and the necessity of a particular remedy to effectuate that purpose. The purpose of Sections 8(a) (1) and (3) of the Act, as construed by the Supreme Court in *Fleetwood* and the Board in *Laidlaw,* was to provide that striking employees retain their status as employees under the Act even after they have been permanently replaced, and as such remain entitled to offers of reinstatement to positions that subsequently become available. In order to protect these rights, the Seventh Circuit in *Laidlaw* held that a retroactive back-pay order was appropriate:

> Unless the disadvantaged strikers are compensated, they will have been penalized for exercising statutorily protected rights *and the effect of discouraging future such exercises will not be completely dissipated.* In these circumstances, it was not arbitrary or capricious for the Board to conclude that complete vindication of employee rights should take precedence over the employer's reliance on prior Board law. (Emphasis supplied). 414 F.2d 99, 107 (1969).

In that case, however, the Board had expressly found that the employer's failure to reinstate former strikers was discriminatorily motivated, as manifested by its "avowed policy of not considering the strikers once they had been replaced" and by the entire pattern of events before and during the strike.[28] Under those circumstances, it may be reasonable to conclude that a mere offer to reinstate is not enough, and that a back-pay order is necessary to prevent discouraging the future exercise of statutory rights by employees who have been subjected to anti-union bias.[29]

In this case, however, there is no evidence that the employer's actions were discriminatorily motivated, or that the relationship between the Company and the Union was characterized by hostility, or that any former striker who personally applied for reinstatement (in re-

---

28. 414 F.2d at 106. Thus, as the court reported in that case:

> "Two days before the strike, foreman Krile told employee Lempke that he had orders to replace the four or five union members in his department. On the day of the strike, plant manager Johnston read the speech to employees in which he emphasized that if they went on strike and were replaced, they would 'lose forever' their right to re-employment by the company. And during the strike, Johnson told foreman Bridges that they should replace the strikers 'as fast as we can' so that they would get rid of the 'troublemakers'." *Id.*

29. *See also* American Machinery Corp. v. NLRB, 424 F.2d 1321, 1330 (5th Cir. 1970), where the court said:

> The Trial Examiner's and Board's finding of discriminatory motivation in the failure to rehire further reinforces our conclusion . . . that refusal of a back pay order in this case would indeed discourage concerted activities by the employees at the American Machinery plant. Consequently, we cannot treat American Machinery as an innocent party unfairly prejudiced by its strict compliance with the law.

sponse to the invitation by the Company to do so, extended through the Union) was ever refused employment or denied any of his former rights. It is true, as the Supreme Court noted in *Fleetwood,* that the presence or absence of discriminatory motivation is irrelevant to the question of a striker's continuing status as an employee under the Act. But when the question involves the appropriateness of a particular remedy, the totality of circumstances are to be taken into account in order to strike a just balance. A remedy which may be appropriate to counter manifest discrimination may not be necessary to effectuate the purposes of the Act in a case where no discrimination is shown, and where the record shows, as here, that the employer, once the new rule is announced, has moved promptly to comply.

Since the circumstances of this case do not reflect discriminatory treatment or present any of the other considerations calling for the retroactive application of the Board's order, we conclude that

. . . the practical operation of the Board's change of policy . . . is to work hardship upon [the Company] altogether out of proportion to the public ends to be accomplished. NLRB v. Guy F. Atkinson, 195 F.2d 141, 149 (9th Cir. 1952).

Therefore, enforcement of the Board's order, insofar as it relates to reinstatement and back-pay liability for any period before the Supreme Court's decision in *Fleetwood,* is denied.

As we have said hereinabove, the advent of *Fleetwood* marks the earliest point at which the Company could be said to have been put on notice that it must deal differently with former striking employees in respect of reemployment. The Fifth and Second Circuits have regarded *Fleetwood* as clothing the Board with remedial discretion to apply *Laidlaw* retroactively, and we are not disposed to dispute that conclusion. *Fleet-*

*wood* was decided on December 18, 1967, and the Company did not begin offering reinstatement until some time in August of 1968. Thus we remand this case to the Board for further consideration of remedies in the light of what we consider to be its discretion to apply *Laidlaw* retroactively to vacancies occurring after January 15, 1968 (a date providing a reasonable time for notice of the *Fleetwood* decision).

## IV

The remaining issue before us involves the Board's finding of an unfair labor practice in the Company's withdrawal of recognition from the Union on February 22, 1967. To support its claim of good faith doubt as to the Union's continuing majority status, the Company points to the fact that, in a bargaining unit of approximately 400 workers, 107 failed to join the strike, 82 who initially joined abandoned it and returned to work, and 100 were hired as permanent replacements during the strike. The Company does not contest the Board's position that the 105 unreinstated strikers (who may be presumed to support the Union) comprise the remaining employees in the bargaining unit, but argues that, even if they are included, the Company had a basis for questioning the Union majority.

Although an employer is permitted to refuse to bargain with a certified union after the expiration of one year from the time of its certification if he entertains a good faith doubt as to its continued majority support, the union is still presumed to represent a majority of the unit; and the refusal to bargain must clearly rest on more than an allegation of subjective good faith doubt, easily made and difficult to refute.[30] It must be founded in reason, and represent a doubt engendered by facts which provide some guarantee of objectivity.

30. *See* NLRB v. Gulfmont Hotel Co., 362 F.2d 588, (5th Cir. 1966); NLRB v. Rish Equipment Co., 407 F.2d 1098 (4th Cir. 1969); Celanese Corp., 95 NLRB 664 (1951).

The Board has long held, with judicial approval, that an employee's failure to join a strike, or his subsequent abandonment of a strike, cannot give rise to any presumption that he repudiates the Union as his bargaining representative.[31] Thus, it was not improper for the Board to conclude that the Company had no appropriate basis for doubting that a majority continued to support the Union, and to order it to bargain.

The petition in No. 24867 is denied; and, in No. 71–1103, enforcement is granted except as otherwise provided hereinabove and this case is remanded for the purpose stated.

It is so ordered.

---

31. NLRB v. Frick Co., 423 F.2d 1327, 1333 n. 12 (3rd Cir. 1970) ; NLRB v. Easton Packing Co., 437 F.2d 811 (3rd Cir. 1970) ; West Fork Cut Glass Co., 90 NLRB 944, enf'd in relevant part sub nom. NLRB v. Borchert, 188 F.2d 474 (4th Cir. 1951) ; Palmer Asbestos and Rubber Co., 160 NLRB 723 (1966).